**In re FIDELITY SAVINGS & LOAN ASS'N.**

**No. 17433.**

District Court, S. D. California, Central Division.

Nov. 3, 1931.

Stoner & Gardner, of Los Angeles, Cal., for petitioning creditors.

Anderson & Anderson & Sheahan and Edward M. Auslender, all of Los Angeles, Cal., for intervening creditor Louis Porter.

Call & Murphey, of Los Ángeles, Cal., Orrick, Palmer & Dahlquist, of San Francisco, Cal., and O'Melveny, Tuller & Myers, of Los Angeles, Cal., for alleged bankrupt and another.

HOLLZER, District Judge.

This proceeding comes before us upon a petition of three alleged creditors seeking to have the Fidelity Savings & Loan Association, a corporation, hereinafter referred to as the Association, adjudicated an involuntary bankrupt.

In the body of the petition, the petitioning creditors are alleged to be Mrs. A. E. McMullin, Myrtle Ione Schnoor, and Mrs. W. A. Short. At the end of the petition, the following three names are typewritten, to wit: "A. E. McMullin," "Myrtle Ione Schnoor," and "W. A. Short." Except as just indicated, the petition is not signed. Only one of the petitioners, namely, Myrtle Ione Schnoor, verified the same.

The only ground upon which it is alleged that an adjudication of bankruptcy should be declared is pleaded in the following language:

"That within four months preceding the filing of this petition the said alleged bankrupt committed an act of bankrupt in that it did make a general assignment for the benefit of its creditors, to-wit:

"That within the said four months period and to-wit: on or about the 23d day of May, 1931, the said alleged bankrupt did transfer all its assets to the Pacific States Savings and Loan Company, a corporation for the benefit of the creditors of said alleged bankrupt Fidelity Savings and Loan Association."

To this petition the Association has interposed a motion to dismiss said petition and a motion to strike said petition from the files. In support of said motions, there has been filed the affidavit of one M. T. Williams, the secretary of said Association. According to said affidavit, the only transfer of assets made by the Association was a certain agreement entered into under date of May 23, 1931, between the latter and the Pacific States Savings & Loan Company, a copy of which agreement is set forth in said affidavit.

In addition, application has been filed by the Title Insurance & Trust Company, an alleged creditor, for leave to intervene in opposition to said petition for involuntary adjudication, and at the same time said company has filed a motion to dismiss said petition and also a motion to strike said petition—supported by the affidavit of said M. T. Williams; said motions and affidavit being virtually identical to those interposed by the association.

At the hearing, leave was granted to one Louis Porter to intervene as a creditor herein and to join the petitioning creditors in their original petition.

Recognizing the insufficiency of the original petition, application was made at the hearing by the petitioning creditors for leave to file an amended petition.

To this the Association, and likewise the Title Insurance & Trust Company, have interposed certain objections.

At the close of the oral argument, the court, after announcing that it would allow counsel to file additional points and authorities, suggested that, in preparing the same, counsel keep in mind the following observations:

"The Court feels that in considering the matter of whether or not its discretion should be exercised in favor of the request to file an amended petition, that it should take into account that every step in this suit by which affirmative relief is sought is a step in the direction that we know, by experience and history, is one that involves tremendous loss to practically everybody connected with it. None of us can deny that side of the picture. That is the result of bankruptcy, almost invariably. When the Court makes that observation, of course it has in mind those whose interests are really at stake. Then too, in the exercise of its discretion, the Court should keep the fact in mind that

although thousands of people are concerned in this transaction, no one has come forward to seek the relief that is sought in this proceeding until what might very properly be described as the eleventh hour. It is apparently conceded in this case that there are not only millions of dollars at stake and thousands of people whose interests are involved, but that at least we have before us an arrangement or contract whereby at least a definite and concrete solution is offered to what otherwise might be termed a very distressing situation. While this Court will not presume to say that bankruptcy would not produce an equally good result, it is rather straining one's credulity to conjure up a result through bankruptcy which will produce an equally assuring hope. Counsel, during the course of the argument has made some reference to the fact that if an adjudication in bankruptcy is made the alleged purchaser would still have the right to offer to the bankrupt estate an arrangement identical or similar to that embodied in the written contract before us. Theoretically that is true, but bitter experience tells us that when we throw things, so to speak, upon the auction block, the bidder, either consciously or unconsciously, being subjected to the frailties and selfishness of human nature, bids no more than he is required to offer. So these are naturally matters that must pass through the mind of the Court in considering in what direction its discretion should be exercised. Then, too, the Court is very much impressed with the principle enunciated in the opinion of Judge James that the requirement of verification on the part of each and all petitioning creditors is something more than a mere matter of form; that it has very much of substance and reason back of it. It may be, however that the decisions recognize—and counsel will have an opportunity to point that out to the Court —it may be that the decisions recognize that that is not only a defect that should be readily permitted of correction, but correction under circumstances at least somewhat analogous to those confronting the Court in this case. But, over and beyond all these other considerations about which we have spoken, we come back to this fundamental objection, which has been very largely the basis of our discussions here, namely, that assuming we brushed aside all other opposition, where would it lead us? Would we still be confronted with a situation which, in its final analysis, is a contract of sale, more or less involved as to its terms, or that which, under the bankruptcy act, is contemplated by the term 'assignment for the benefit of creditors?' In that regard we may not be amiss in pointing out to counsel that in answering that question we at once have in mind the proposition that any corporation may, for example, with the consent of a certain percentage of its stockholders, dispose of all of its assets, regardless of whether the creditors consent or not, and regardless of the fact that some people may think it is a bad bargain or not the best bargain that could be made. Such wholesale disposition of assets on the part of corporations is not new to our jurisprudence. We do know—not that it is frequent, but it has occurred, as can be amply shown by the records of the courts—that people sometimes do make peculiar sale contracts; sometimes a contract of sale wherein the vendor guarantees to repurchase the property within a certain period of time at the purchase price, if the vendee should elect to have such resale consummated. Now, confessedly, that is not the usual mode whereby people sell property. And in this instance we should like to have counsel for petitioning creditors keep in mind not only this general proposition that corporations may, under certain conditions, dispose of their assets in their entirety without consulting creditors, but whether this contract will reasonably lend itself, if you please, to either interpretation, that is to say, either to the construction that we have a sale, with more or less involved terms of payment, on the one hand, or an assignment for the benefit of creditors on the other; and if so, should not the Court, if the door is open to such alternative constructions, place that interpretation upon the contract which confessedly, the parties, in the very plainest of language have said should be its interpretation?"

"After reading the briefs filed on behalf of the petitioning creditors and the intervening creditor, and after giving consideration to the authorities cited, we feel that little need be added to the views expressed at the close of the oral argument.

That the original petition is defective in substantial particulars we have no doubt. We are equally certain that the petitioning creditors are not entitled, as a matter of right, to file an amended petition, but that, on the contrary, the granting or denial of permission to file the same is a matter which rests in the sound discretion of the court.

As disclosed in the oral argument, the Association which by this proceeding it is sought to have adjudicated a bankrupt is a

building and loan association, having, at the time of the execution of the contract above mentioned, assets of the purported value of $37,000,000, and liabilities amounting to approximately $32,000,000. Of the latter, approximately $30,000,000 represented the principal amount owing to depositors, of whom there are about twenty thousand; an additional $500,000 represented the accrued interest owing to such depositors, while the balance was owing to general creditors.

By this contract, the Pacific States Savings & Loan Company, a building and loan association (hereinafter referred to as the Company), agreed to pay to the association, unconditionally, an amount equal to 75 per cent. of the principal sum owing to the latter's depositors, plus the total amount of accrued interest owing to said depositors, and also the full amount of the indebtedness owing to general creditors.

As additional consideration for the assets transferred to it, the Company agreed to pay interest at 6 per cent. per annum for a period of five years upon the full amount of the principal sum owing to the depositors, also the further sum of $1,000,-000 for the good will of the Association, and also, under certain conditions, and as the balance of the purchase price, a further sum amounting to a possible additional 25 per cent. of the principal sum owing to the depositors. These last-mentioned conditions contemplate that the Company, although not obligated to do so, may sell the real estate and certain other assets acquired by it from the association, also that the mortgages, trust deeds, and like obligations purchased under this contract may be collected in full. Accordingly, a period ranging from five to seven years from the date of the contract has been fixed as the time within which an appraisal shall be made to determine the amount to be paid by the Company as such balance of the purchase price.

These conditions are set forth in the contract at considerable length and in rather elaborate detail. Counsel for petitioning creditors have placed much emphasis upon these provisions. They argue that such stipulations are not ordinarily to be found in a contract of sale, and hence it is insisted that the transaction is not a sale, but a general assignment in trust for the benefit of creditors.

It must be conceded that this contract contains many unusual stipulations. On the other hand, it is likewise true that an undertaking involving the sale, by a building

and loan association, of assets valued at approximately $37,000,000, under the extraordinary economic conditions which have prevailed for the past two years, would be practically impossible of consummation, except pursuant to stipulations not ordinarily incorporated in a contract of sale.

Section 647a of the California Civil Code provides: "Any two or more building and loan associations may unite and become incorporated in one body, with or without any dissolution or division of the funds of either of them; or any such corporation, association or society may transfer its engagements, funds and property to any other like corporation, association or society upon such terms as may be agreed by an unanimous vote of their respective boards of directors, ratified by the written consent of the shareholders holding more than two-thirds of the shares in force in each of the respective contracting associations; provided, however, that any such consolidation or transfer must also be approved by the official or officials vested by law with powers of state supervision and license."

It is not disputed that the contract between the Association and the Company has received the unanimous approval of the respective boards of directors of the two organizations, also the approval of shareholders holding more than two-thirds of the shares in force in each of said organizations, and, in addition, has been approved by the building and loan commissioner of the state of California.

■ It is a cardinal rule in the construction of all contracts that the intention of the parties is to be inquired into, and, if not forbidden by law, is to be effectuated. Bradley v. Washington, etc., Co., 13 Pet. 89, 10 L. Ed. 72; Mauran v. Bullus, 16 Pet. 528, 10 L. Ed. 1056; Chesapeake, etc., Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64.

■ In the interpretation of written instruments, the intention of the parties must control, such intention to be gathered from the words used according to their ordinary signification, if they be clear and explicit. U. S. v. Choctaw Nation, 179 U. S. 494, 21 S. Ct. 149, 45 L. Ed. 291.

■ The contract in question, paragraph nineteenth, subdivision 5 thereof, declares: "The within agreement and conveyance is intended by the parties hereto as a present sale and transfer of the above described properties by Fidelity to Pacific States, in consideration of the payment of the pur-

chase price therefor hereinabove mentioned, and neither the Pacific States nor the State Guaranty assumes hereby any trust obligation to the Fidelity or its creditors or any obligations other than those herein expressly assumed. It is, moreover, specifically understood and agreed that neither Pacific States nor State Guaranty assumes hereby any obligation to distribute said purchase price or other funds to or for the benefit of creditors or stockholders of Fidelity, or otherwise."

In unmistakable language the parties to this contract have declared it to be their intention that said agreement shall constitute a present sale by the Association of its assets to the Company, and that no trust obligation is assumed by any one.

We find nothing in the contract making it impracticable to effectuate this intention of the parties.

The essential provisions of this contract —including the unconditional obligation of the vendee to pay in full the amount of the indebtedness owing to the general creditors, a like obligation to pay not less than 75 per cent. of the indebtedness owing to the depositors, and the further like obligation to pay the full amount of accrued interest owing to the depositors, plus interest for five years upon the principal sum owing to the depositors, and the absence of any stipulation compelling anybody to appropriate and sell the property transferred and appropriate or distribute the proceeds therefrom among the creditors—these provisions constitute obligations utterly incompatible with an assignment in trust for the benefit of creditors.

As pointed out during the oral argument, neither in the original petition nor in the proposed amended petition is any claim made that the Association is insolvent. The sole basis upon which it is alleged the present proceeding rests is the execution of said contract of May 23, 1931, the making of which was called to the attention of all the creditors of the Association approximately four months before this case was instituted.

After this lapse of time, so far as the record before us discloses, only four, out of a total of approximately twenty thousand, creditors of an Association possessing assets admittedly worth many millions of dollars, seek to attack this contract, and thereby to have said Association adjudicated a bankrupt. To accomplish that result, the petitioning creditors request permission to file an amended petition so as to present such issue legally before the court.

These circumstances we regard as extremely significant.

In this connection, we deem it appropriate to quote from the opinion rendered in the case of In re Farthing (D. C.) 202 F. 557, pages 569, 570 and 571, wherein Judge Connor quite forcefully pointed out: "An administration of the estate in and through the bankrupt court, under most favorable conditions, would entail statutory fees, commissions, and cost very greatly in excess of the amount authorized to be expended by the deed. This expense would be largely, how much it is impossible to suggest, increased by reasonable allowances to attorneys. That an adjudication of bankruptcy would result in immense litigation at immense cost cannot be doubted. Experience teaches that under the most careful control the expenses incident to a proceeding in bankruptcy are very large. If the power to permit an amendment to the petition is to be exercised in 'furtherance of justice' to the debtor and his other creditors, the question as to the manner of its exercise is not debatable. What lawful benefit can accrue to the petitioners by bringing the administration of the estate into the bankrupt court? * * * To deny the motion deprives the petitioners of no lawful or just right to which in a court of equity they are entitled. To grant the motion would result in throwing upon the market a large quantity of real estate in many parcels, incumbered with a burden of uncertain extent, impossible of ascertainment. It is of common knowledge that at sales made under such conditions, speculators have an advantage over men who wish to buy fair titles at fair prices. * * *"

In the course of the oral argument, counsel for the petitioning creditors asserted: "We believe that somehow in this proceeding, after the schedules shall have been filed and the evidence appears as to the facts and circumstances back of the deal which now is under consideration, when all the facts shall have appeared, that then will be the proper time for your Honor to pass upon the merits of this situation, the public policy involved, the gain or loss to creditors involved, and in a sweeping view of the entire situation and all the facts of the situation, to be revealed by the evidence, then determine whether an act of bankruptcy has been committed, and, if so, then whether the better interests of the real parties in interest

here, the creditors, will be conserved, whether the real interests of the public, which is to be considered in this case, will be best conserved or not, and whether any other party primarily in interest will have his interest conserved best through an adjudication of bankruptcy or through sanction to a deal which has never yet been exposed to the light of day and to the searching inquiry which the creditors are entitled to have. It may well be, if the Court please, that when the facts are revealed the creditors will come to the same conclusion that our own Building and Loan Commissioner came to, namely, and to wit, that, with the facts as they are, this is the best thing to do; and, if they do, they certainly then would join in a move to make this deal in substance some time. * * * If the Court please, we feel that the discretion of your Honor in admitting this amended petition, and then opening the issues, which will be met without any unnecessary delay, would be the proper exercise of judicial discretion to best conserve the public interest and to satisfy the thirty thousand more or less creditors of Fidelity that the deal made is the best deal. That is all we want to know."

Again in their closing brief these counsel declare:

"Only through true full revelation by evidence can the facts be obtained upon which both the Court and the creditors may satisfy itself and themselves that the present proposed deal is to their advantage, and these facts will not be available for consideration of this Court should it see fit to deny the motion for leave to file an amended complaint. * * *

"We do not say we cannot eventually be satisfied of the merits of the present proposed deal."

"Numerous other danger points present themselves by reason of that which we feel that no prejudice against bankruptcy in general should be permitted to prevent a searching inquiry into the facts of the present proposed deal. * * * We fail to feel from our standpoint as creditors that bankruptcy is either as disastrous or as dangerous as the proposed transaction, though should it appear when the facts are revealed to our own interests as creditors so to do, we most certainly shall be the first to place the stamp of approval upon the proposed transaction and withdraw from the present proceeding. * * * "

Stripped of its legal verbiage, and in its final analysis, this contention means that, by the proposed amended petition, the petitioning creditors seek to employ the bankruptcy jurisdiction of this court for the purpose of investigating whether the sale made under this contract by the Association to the Company was the best bargain that could have been consummated, and, if such inquiry should confirm the wisdom of that sale, then this proceeding will be dismissed.

We are convinced that neither upon reason nor authority would the court be justified in exercising its discretion in a manner which would permit such a proceeding to be prosecuted.

In view of the foregoing considerations, and particularly since we are satisfied that the contract of May 23, 1931, was a sale, and not an assignment for the benefit of creditors, our conclusion is that the application for leave to file the proposed amended petition should be denied, and that the motion to dismiss the original petition should be granted.

Exceptions will be allowed the petitioning creditors and to the intervening creditor, Louis Porter.

Counsel for the association will prepare an order in conformity with this opinion.