[Civ. No. 13706. Second Dist., Div. Two. Feb. 23, 1943.]

JOHN EGGERT et al., Respondents, v. PACIFIC STATES SAVINGS AND LOAN COMPANY (a Corporation), Appellant; HARLEY HISE, as Building and Loan Commissioner, etc., Intervener.

O'Melveny & Myers, Louis W. Myers, Pierce Works, W. B. Carman, Jr., and Sidney H. Wall for Appellant.

Hugo H. Harris, David E. Field, R. W. Katerndahl, Wood, Crump & Rogers and Guy Richards Crump for Respondents.

George A. Dennison and W. G. Harmon, as Amici Curiae, on behalf of Intervener.

McCOMB, J.—Plaintiffs brought the present action in a representative capacity for the purpose of impressing a trust upon assets or their derivatives alleged to have been transferred May 23, 1931, by Fidelity Savings and Loan Association (hereinafter referred to as Fidelity) to defendant, Pacific States Savings and Loan Association (hereinafter referred to as Pacific States or defendant).

Defendant appeals from the judgment in favor of the plaintiff insofar as it (a) holds that the transfer of property from Fidelity to Pacific States pursuant to the agreement of May 23, 1931, constituted a transfer in trust as distinguished from an absolute sale of the assets of Fidelity to Pacific States, (b) awards judgment on the accounting to holders of Pacific States Issued Fidelity participating certificates in the sum of $1,363,251.40, (c) impresses a lien upon the Fidelity transferred realty or realty derivatives within the State of Cali-

fornia as security for the payment of the sum awarded, and (d) orders the appointment of a receiver in aid of the judgment in favor of the participating certificate holders.

The main issue raised by the pleadings in the present action was: Did the transfer of assets from Fidelity to Pacific States by the agreement of May 23, 1931, mentioned *supra*, constitute an outright sale of the assets of Fidelity to Pacific States or a transfer in trust for the benefit of Fidelity, its creditors, and certificate holders?

The trial court held in favor of plaintiff's contention that the agreement constituted a transfer in trust for the benefit of Fidelity, its creditors, and certificate holders.

Defendant urges four propositions as reasons for the reversal of the judgment of the trial court. These propositions will be stated and answered hereunder seriatim.

*First: There was no substantial evidence to sustain the trial court's finding that the transfer of property from Fidelity to Pacific States pursuant to the agreement of May 23, 1931, constituted a transfer in trust as distinguished from an absolute sale of such property.*

This proposition is untenable and is governed by the facts hereinafter set forth and these pertinent rules of law:

(1) The agreement of the parties to an instrument that it shall constitute a present sale and not be construed as a transfer of property in trust cannot change the true character of the agreement of the parties as disclosed by the instrument which evidences the transaction. (See *Mahoney* v. *San Francisco*, 201 Cal. 248, 258 [257 P. 49]; *Stockton Savings & Loan Society* v. *Purvis*, 112 Cal. 236, 239 [44 P. 561, 53 Am.St.Rep. 210]; *San Joaquin L. & P. Corp.* v. *Costaloupes*, 96 Cal.App. 322, 332 [274 P. 84]; also 1 Scott on Trusts (1939) 37, sec. 2.8.)

(2) Whenever uncertainty arises concerning the meaning of a written agreement, the trial court will receive evidence as to what the parties themselves understood the agreement to mean and when they have acted upon that understanding and the trial court has made a finding that the agreement should be construed as acted upon by the parties, such finding will not be disturbed upon appeal *(Thew* v. *Thew*, 35 Cal.App.2d 691, 695 [96 P.2d 826]).

(3) To constitute a sale of property as distinguished from other agreements or transfers relative to property it is essential that in addition to other elements the absolute or

general property in the thing sold be transferred from the vendor to the vendee *(Christensen* v. *Cram,* 156 Cal. 633, 635 [105 P. 950]; *Van Allen* v. *Francis,* 123 Cal. 474, 479 [56 P. 339]; sec. 1721 Civ. Code[1]).

(4) A trust is any arrangement which exists whereby property is transferred with an intention that it be held and administered by the transferee (trustee) for the benefit of another *(Estate of Shaw,* 198 Cal. 352, 360 [246 P. 48]; *Raffo* v. *Foltz,* 106 Cal.App. 51, 55 [288 P. 884]; 4 Am.Jur. (1936) 357, sec. 39; 2 R.C.L. (1929) 664, sec. 20).

(5) The power of an appellate court in reviewing the evidence on appeal from a judgment on the ground of insufficiency of the evidence to support findings of fact *begins* and *ends* with a determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the questioned finding of fact *(Raggio* v. *Mallory,* 10 Cal. 2d 723, 725 [76 P.2d 660]; *Estate of Winzeler,* 42 Cal.App.2d 246, 248 [108 P.2d 720]).

The agreement of May 23, 1931, between the parties contained the following relevant provisions:

"FIFTH: It is the intention of the parties hereto that title to all of said assets referred to the assets of Fidelity shall be, and the same is hereby, transferred to and vested in Pacific States, for and in consideration of the purchase price and other considerations hereinafter mentioned."

"TWELFTH: A. Pacific States (subject to the provisions of Paragraph Twentieth hereof) shall have charge of the sale of all Real Property (as hereinafter defined) and all other assets acquired by it from Fidelity and may sell the same at such prices and on such terms and conditions as in its sole discretion it may determine without any approval from Fidelity; provided, that without the approval as to price and terms of sale of a representative of Fidelity appointed for the purpose, Pacific States will not (a) sell any notes or street im-

[1]The cited section on May 23, 1931, read thus:

"Sale is a contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property."

This section was repealed by the Legislature by the Statutes of 1931, p. 2234, and the present Civil Code section 1721 added by statutes of 1931, page 2235, subsection 2 thereof, reads as follows:

"A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price."

provement bonds acquired from Fidelity for a period of four (4) years from date hereof, (b) sell any Real Property (as hereinafter defined) for a period of four (4) years from the date hereof unless the annual quota of sales hereinafter set forth shall not be met, or (c) sell any other assets acquired from Fidelity hereunder for a period of two (2) years from the date hereof.''

''NINETEENTH: 1. Pacific States hereby further agrees:

'' (a) To furnish to Fidelity, at least quarterly, full, true and correct statements showing in detail, and in form satisfactory to Fidelity, the status of all assets transferred to Pacific States hereunder, together with such other statements and/or information as Fidelity may require in order to maintain its books of account, to determine the status of the *liquidation* of said assets, and generally to inform itself as to matters involving its rights under the terms of this agreement. . . . (Italics added.)

''5. The within agreement and conveyance is intended by the parties hereto as a present sale and transfer of the above described properties by Fidelity to Pacific States, in consideration of the payment of the purchase price therefor hereinabove mentioned, and neither the Pacific States nor the State Guaranty assumes hereby any trust obligation to the Fidelity or its creditors or any obligations other than those herein expressly assumed. It is, moreover, specifically understood and agreed that neither Pacific States nor State Guaranty assumes hereby any obligation to distribute said purchase price or other funds to or for the benefit of creditors or stockholders of Fidelity or otherwise.''

It is evident that under rule 1, *supra,* the statement in paragraph NINETEENTH, subdivision 5, was not conclusive upon the parties. It is likewise apparent from an examination of the statement in paragraph FIFTH of the agreement that it was the intention of the parties that title to all of the assets of Fidelity should be transferred to and vested in Pacific States. This statement creates an ambiguity in the agreement when read in connection with the statement in paragraph TWELFTH to the effect that sales of property of Fidelity for the period of four years should not be made without obtaining first the approval of Fidelity as to the price and terms of the proposed sale. This ambiguity is further emphasized by the reference in paragraph NINETEENTH to the transaction as "the liquidation of said assets." To resolve this ambiguity the trial court

under rule 2, *supra,* properly received evidence as to what the parties themselves understood the agreement to mean. A portion of such evidence was as follows:

Mr. Robert S. Odell, President of Pacific States, testified in part thus:

"Nothing was said in that conversation (referring to negotiations preliminary to the agreement) about what Pacific States would get for making this liquidation, other than what I said, that we would be entitled to at least $500,000 a year gross profit, plus a reasonable allowance for additional operating costs. I don't recall that when the contract was finally written we were to get far beyond that. Eventually the auditors prepared what has been termed a formula, but that was to produce the 7.2% guaranteed yield. There was provided in that formula $500,000, as a gross differential. There was $100,000 for additional expense on license fees and taxes and all those things. As I recall it there was $500,000 going to be the gross with an allowance of $100,000 additional expenses that we would entail by bringing all those assets into Pacific States."

Further, on September 15, 1934, Mr. Odell sent a letter to the investors of Pacific States reading in part as follows:

"Fidelity Liquidation: Under the contract whereby this institution took over for liquidation the assets of Fidelity Savings & Loan Association in the year 1931, there were reissued in exchange for Fidelity certificates two new certificates, the first being an Investment Certificate of Pacific States Savings Guaranteeing 75% of the face value of the investment, and the other a certificate for 25% of the face value and which calls for a participation in whatever is yielded through the liquidation over and above the 75% guaranteed.

"Accordingly, a reserve equivalent to the capital liability plus 25% of the Fidelity Investment certificate liability at the time of the take-over was set up on our books and it is against this reserve that losses are being written down as we liquidate Fidelity assets."

Mr. Earl M. Leafe, a director and vice-president of Fidelity, testified as follows:

"I don't recall that we discussed the question of sale. We spoke of it as a take-over. I don't recall that anybody defined what they meant by the word take-over. There was no discussion of the price of any sale. The only discussion that involved amounts of money related to the compensation which

Mr. Odell said Pacific States would have to have as a condition of the deal. This was in the very first stages of the negotiations. There wasn't any definition of the deal. It was simply that Pacific States would take over Fidelity on some sort of terms to be agreed upon. Mr. Odell said that he had reconsidered his previous decision not to try to work out a deal and that he was willing to undertake negotiations to see whether a deal could be worked out. He said that he wanted it clearly understood that as a condition of any deal Pacific States would have to receive as compensation for its services, the sum of $500,000 a year and an additional amount of $100,000 a year to cover the prorata of the general overhead which he felt would be applicable to the administration of Fidelity assets.

"I had many conversations with Mr. Grow and Mr. Wilke and other directors of Fidelity about this matter. The purpose of this agreement generally revolved about the orderly liquidation of Fidelity assets, the protection of the Fidelity certificate holders and the making of an arrangement to secure as large an amount of recovery to the Fidelity certificate holders as would be possible and to avoid liquidation by the Building and Loan Commissioner or by other public agency.

"There were discussions of forms of compensation or profit to Pacific States by reason of the take-over other than the payment of fees and charges for liquidation. There was discussion of the payment of the $500,000 item of profit. I suppose you would call that a fee for liquidation. It was a charge that was included in the contract."

Mr. A. E. Grow, executive vice-president and director of Fidelity, testified as follows:

"I don't recall that any reference was made to a sale of the assets of Fidelity in that conversation. No reference was made to the purchase of Fidelity assets by Pacific States. That was the beginning of the negotiations which consummated in the contract of May 23, 1931, between Fidelity and Pacific States. We told Odell that owing to the depression and the failure of the Guarantee Building & Loan we were having very heavy withdrawals in Fidelity and were getting into a rather precarious position and we wanted, if possible, to work out some plan whereby Pacific States would take over the assets of Fidelity and liquidate them, thereby affecting a tremendous saving in the overhead cost of handling the business. Nothing definite was consummated at that conference."

May 23, 1931, Mr. George L. Eastman, then president of Fidelity, sent a circular letter to the certificate holders of Fidelity, which contained this statement:

"That the fundamental values behind Fidelity assets are more than sufficient for every investor in this association to receive 100% on his investment plus his interest at 6% at the time of payment. . . . There will be very substantial assets available to the stockholders. . . . This has been accomplished under the present arrangement and at the same time has not taken from Fidelity any of the assets which secured its certificate holders."

From the foregoing evidence it is apparent that responsible executive officers of both Fidelity and Pacific States considered the agreement as evidencing a transaction whereby the Pacific States was to liquidate pursuant to the terms of the agreement of May 23, 1931, the assets of Fidelity for the benefit of those beneficially interested in Fidelity.

It is conceded that the assets of Fidelity were assigned on the books of the Pacific States a number with "F" preceding it to distinguish such assets from the other assets owned by Pacific States and that prior to 1936 the earnings from the assets of Fidelity were not taken into account as ordinary earnings of the Pacific States nor returned by Pacific States as part of its federal income tax; also Fidelity's income tax return for the year 1931 bears the following notation:

"The assets of this corporation were sold to Pacific States Savings and Loan Company on a liquidation basis under an agreement dated May 23, 1931, whereby we received the income on the assets and paid various expenses and charges for the handling of the liquidation."

Subsequently the same notation was made on Fidelity's income tax returns for the year 1937-1938.

The foregoing evidence constitutes substantial evidence to sustain the trial court's finding that it was in fact the intention of the parties that the assets of Fidelity be transferred to Pacific States in trust for the purpose of liquidation. Since, therefore, it was not an absolute transfer of the assets of Fidelity to Pacific States, it was not a sale under rule 3, *supra*, but the transaction constituted a transfer in trust pursuant to the requirements of rule 4, above.

In view of the requirements as set forth in the provisions of rule 5, *supra*, further discussion of the evidence would not serve any useful purpose.

The following cases presented by defendant are factually distinguishable from the instant case:

In *Broderick* v. *Betco Corp.*, 149 Misc. 245 [267 N.Y.S. 139], the sole question before the court was whether the superintendent of banks was entitled to maintain an action for an assessment against a stockholder of a trust company which the superintendent of banks had taken over for the purpose of liquidation. The court held that even though the contract was one of sale the superintendent of banks had authority to institute the action.

In *Bassett* v. *City Bank & Tr. Co.*, 116 Conn. 617 [165 A. 557], absolute title to the property in question was transferred without any reservation or right of the transferor to the management or disposition of the transferred property.

In *First National Bank* v. *Harris*, 27 F.2d 117, there was no provision in the agreement for the return of any of the assets to the transferor.

In *Sturdivant Bank* v. *Houck*, (Mo.App.) 47 S.W.2d 135, the property transferred was without restriction or any control being reserved in the transferor. A similar situation prevailed in the cases of *Gockstetter* v. *Williams*, 9 F.2d 354, and *Keiler* v. *Tutt*, 31 Mo. 301.

*St. Helens Quarry Co.* v. *F. T. Crowe & Co.*, 90 Ore. 284 [176 P. 427], is based on the proposition that the parties by their conduct were estopped from treating the contract in question as one other than an outright sale.

In re *Fidelity Savings & Loan Assn.*, 53 F.2d 241, which was a proceedings to have Fidelity declared an involuntary bankrupt is not binding upon this court. An examination of that case discloses that the question there presented was whether or not the court should permit the petitioning creditors in bankruptcy to file an amended petition, it being conceded that the one then before the court was defective. The court declined to permit the filing of the amended petition, indicating that in its opinion a better result would be obtained for all parties concerned if Fidelity were not adjudicated a bankrupt. The discussion in the opinion relative to the character of the agreement between Fidelity and Pacific States was obiter dictum and not pertinent to the question there presented for decision.

*Second: If the agreement of May 23, 1931, between Fidelity and Pacific States be held to be a transfer in trust for the purpose of liquidating the assets of Fidelity and not*

*a sale, then, since the State Building and Loan Commissioner approved the agreement, it constituted an unlawful delegation of power by the State Building and Loan Commissioner to Pacific States, and, therefore, the agreement was void.*

This proposition is likewise untenable. It is to be noted that the then State Building and Loan Commissioner, Mr. H. L. Carnahan, testified that he did not want to take over Fidelity for the purpose of liquidation but believed that, if someone else with the financial ability, integrity, and reputation took over the Fidelity assets for liquidation, a better result would ensue. The record discloses that in fact the State Building and Loan Commissioner did not exercise his power, assuming he could have done so, to take over the liquidation of Fidelity. Therefore, it is obvious that his assent to the agreement between Fidelity and Pacific States could not have constituted a delegation of his powers and duties to liquidate Fidelity.

The contract between Fidelity and Pacific States, whereby the one transferred to the other its assets for the purpose of liquidation was perfectly legal, there being no provision in the Building and Loan Commission Act of 1911 (Stats. 1911, p. 607 as amended, Deering's Gen. Laws, 1923, 1925-27, 1929, Act 982), which was in effect May 23, 1931, or any other provision of law which made it illegal for one building and loan association to transfer to another for a proper consideration its funds and/or property.

*Jackson* v. *McIntosh,* 12 F.2d 676, *Mobley* v. *Marlin,* 166 Ga. 820 [144 S.E. 747], and *Stogner* v. *Brooks,* 40 Ga.App. 598 [151 S.E. 48], are not here in point, for the reason that in each of the cases cited the assets of the bank involved in each case had been taken over and were in the actual legal possession and control of the authorized statutory officer for purposes of liquidation. In each instance such officer had attempted to assign his duties of liquidation to another, which attempt was held in each case to be unlawful and nugatory. As heretofore pointed out in the instant case, the Building and Loan Commissioner had not exercised any power or right for the purpose of liquidating Fidelity.

■ *Third: The statute of limitations, sections 318 and 343 of the Code of Civil Procedure, constituted a bar to plaintiffs' cause of action.*

This proposition is also untenable. Defendant's argument and authorities are predicated upon the theory that Pacific

States became an involuntary or constructive trustee of the assets of Fidelity. However, the trial court found, supported by substantial evidence, as indicated above, that defendant was not an involuntary or constructive trustee of the assets of Fidelity but was a voluntary trustee of such assets. Therefore, the statute of limitations did not commence to run until the agreement between the parties had been completed and a final account rendered. (See *Lezinsky* v. *Mason Malt etc. Co.*, 185 Cal. 240, 244 [196 P. 884], and *Leviston* v. *Tonningsen*, 212 Cal. 656 [299 P. 724].) It is an undisputed fact in the present case that the agreement had not been completed and no final account had been rendered.

 *Fourth: The trial court's findings are inconsistent in that upon the same evidence it found that:*

*(1) As of the final payment date of the agreement of May 23, 1931, as amended, there were $7,554,251.25 outstanding in nominal face amount of participating certificates, and*

*(2) as of the date of judgment there were $4,899,790.62 in nominal face amount of participating certificates outstanding.*

This proposition may not be urged by defendant, for the reasons that:

(1) its own records disclosed, and it asked the trial court to make the finding that there were $7,554,251.25 outstanding in nominal face amount of participating certificates as of the final payment date of the agreement, and

(2) it is not prejudiced by the finding that as of the date of judgment there were $4,899,790.62 in nominal face amount of participating certificates outstanding, because such finding applies only to those who are to participate in the judgment, and by defendant's express disclaimer at the trial it waived any right to participate in the judgment.

Therefore, under the mandate of article VI, section 4½ of the Constitution of the State of California, we are bound to disregard any conflict that might exist between the findings, since defendant could not be prejudiced thereby.

### Contentions of Amicus Curiae

 After the present action was commenced Ralph W. Evans, then Building and Loan Commissioner for the State of California, intervened in the action. Subsequently he resigned and Harley Hise was duly appointed and qualified in his place and stead as Building and Loan Commissioner, and by appropriate proceedings was substituted as intervenor in

the present action. However, the intervenor did not appeal from the present judgment, but after the appeal had been taken to this court, by stipulation of the parties, was permitted to file a brief as amicus curiae. By this brief he urges various propositions for the modification of the judgment which are not presented by either plaintiffs (respondents) or defendant (appellant). These questions will not be considered by us for the reason that the rule is universally recognized that an appellate court will consider only those questions properly raised by the appealing parties. Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered *(Davis v. McCasland,* 182 Okla. 49 [75 P.2d 1118, 1119]; *Samuel Hertzig Corp.* v. *Gibbs,* 295 Mass. 229 [3 N.E.2d 831, 833]; *Dinet* v. *Orleans Dredging Co.,* (La.App.) 149 So. 126, 129; *Corning* v. *Patton,* 236 Ala. 354 [182 So. 39, 42]; *City of Phoenix* v. *Drinkwater,* 46 Ariz. 470 [52 P.2d 1175, 1176]; 3 C.J.S. (1936) 1052, Amicus Curiae, sec. 3(9)aa; see, also, *In re Pina,* 112 Cal. 14, 16 [44 P. 332]).

For the foregoing reasons the judgment is affirmed.

Moore, P. J., and Wood (W. J.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 22, 1943.

The following is the agreement referred to on page 241:

SUPPLEMENT.

AGREEMENT
FOR TRANSFER OF ASSETS
FROM
FIDELITY SAVINGS
AND LOAN ASSOCIATION
TO
PACIFIC STATES SAVINGS
AND LOAN COMPANY
DATED MAY 23, 1931

AGREEMENT
FOR TRANSFER OF ASSETS
FROM
FIDELITY SAVINGS
AND LOAN ASSOCIATION
TO
PACIFIC STATES SAVINGS
AND LOAN COMPANY

THIS AGREEMENT AND CONVEYANCE, made and executed this 23rd day of May, 1931, by and between FIDELITY SAVINGS AND LOAN ASSOCIATION, a building and loan association organized under the laws of the State of California, party of the first part (hereinafter called "Fidelity"), PACIFIC STATES SAVINGS

AND LOAN COMPANY, a building and loan association organized under the laws of the State of California, party of the second part (hereinafter called "Pacific States"), and STATE GUARANTY CORPORATION, a Delaware corporation which is the owner of all of the outstanding Guarantee Capital Stock (except Directors' qualifying shares) of the Pacific States Savings and Loan Company, party of the third part (hereinafter called "State Guaranty"),

## WITNESSETH:

FIRST: Fidelity, for and in consideration of the sum of Ten Dollars ($10.00) and other valuable considerations hereinafter mentioned, hereby grants, sells, transfers and conveys to Pacific States all of the lands, promissory notes, mortgages, deeds of trust, contracts, leases, securities, bonds, stocks, choses in action, cash on hand and in banks, accounts receivable, furniture, fixtures, equipment, business, good will, and all other property and interests in property, both real and personal, owned by Fidelity at the date hereof (all of said property being sometimes hereinafter referred to as the "assets").

SECOND: Fidelity hereby covenants, represents and warrants that it is the owner free and clear, except as shown on the Memorandum dated March 31, 1931, signed by Fidelity and on file in the office of the Building and Loan Commissioner of California (hereinafter referred to as the "Memorandum"), of all liens and encumbrances, except current taxes not delinquent and liens and encumbrances securing liabilities expressly assumed by Pacific States hereunder, of all of the assets shown on said "Memorandum," and that it is duly authorized and empowered to transfer the same as herein provided, and also that from said date to and including the date hereof, it has not done any of the following things, viz.:

(a) Disposed of any of said assets shown in said "Memorandum," excepting only cash in the payment of its debts and normal operating expenses and in the payment of dividends and of principal and interest and on its investment certificates and also that it has not paid, since the close of business on May 14, 1931, any amounts to any one holder of investment certificates of Fidelity in excess of $500.00;

(b) Paid any extra salaries, bonuses or other distributions to any of its officers or employees other than normal salaries in accordance with the past salary scale;

(c) Entered into any contracts or leases except contracts for the sale of real property made prior to May 15, 1931; or

(d) Created any lien on any of its properties without the consent of Pacific States, except liens to secure payment of liabilities expressly assumed by Pacific States hereunder.

THIRD: Fidelity hereby further covenants, represents and warrants that said "Memorandum" contains a full, true and correct statement of all its liabilities of every kind and nature, contingent or otherwise, as of the 31st day of March, 1931, and that all of the schedules numbered one (1) to twelve (12) in said "Memorandum" are full, true and correct, and fully, truly and correctly show all of the facts and items they purport to show. That from said date to and including the date hereof it has not incurred any liabilities in addition to those shown in said "Memorandum," except in the normal course of business, and has in no event entered into any contracts except contracts for the sale of real property made prior to May 15, 1931.

FOURTH: Fidelity hereby further covenants, represents and warrants that prior to the date hereof it has caused to be cancelled and set aside all contracts of sale of real property wherein it is the seller and Fidelity Auxiliary, Ltd., is the purchaser. Fidelity further covenants, represents and warrants that in the case of all property covered by any such contracts of sale which shall have been heretofore re-sold by Fidelity Auxiliary, Ltd., Fidelity Auxiliary, Ltd., has heretofore assigned to Fidelity such contract or contracts of resale. Fidelity further covenants, represents and warrants that no consideration has been paid by Fidelity to Fidelity Auxiliary, Ltd., for the cancellation or assignment of any such contracts, other than the release by Fidelity of its rights and claims against said Fidelity Auxiliary, Ltd., under such contracts.

Fidelity further covenants, represents and warrants that Schedule 12 in said "Memorandum" set forth is a full, true and correct list showing all outstanding contracts of sale of real property from Fidelity Auxiliary, Ltd., to third persons.

FIFTH: It is the intention of the parties hereto that title to all of said assets shall be, and the same is hereby, transferred to and vested in Pacific States, for and in consideration of the purchase price and other considerations hereinafter mentioned. Fidelity further agrees to execute and deliver to Pacific States all such further deeds and other instruments of transfer and conveyance of the property hereinabove referred to (all of which shall be satisfactory in form to Pacific States) as Pacific States may from time to time request Fidelity to execute and deliver to it. Fidelity further agrees forthwith to duly execute and deliver or cause to be duly executed and delivered, to Pacific States all such consents, authorizations, endorsements, resolutions and other instruments, as may be deemed necessary by counsel for Pacific States to the legal and effective assignment and transfer to Pacific States of all of said funds and property. Fidelity further agrees forthwith to endorse (without recourse) to Pacific States, all of the notes

receivable of Fidelity (it being understood that the forms of such endorsements shall not limit or affect the warranties or other terms of this agreement).

SIXTH: Fidelity agrees that after the date hereof it will not:

(a) Engage in the Building and Loan business ·within the County of Los Angeles (which is the principal place of business of Fidelity), State of California, so long as Pacific States, its successors or assigns, shall carry on a building and loan business within said County; or

(b) Engage in the Building and Loan business in the County of San Bernardino or the County of Orange, in which counties Fidelity has places of business, or in any other County in the State of California in which Fidelity has heretofore or is now transacting a building and loan business, so long as Pacific States, its successors or assigns, shall transact a building and loan business therein.

Fidelity further agrees that it will not at any time hereafter sell or transfer to any person, firm or corporation other than Pacific States and/or State Guaranty, its name or the right to use its name or any other name so similar thereto as to be likely to deceive, and also that it will not hereafter use such name except for the purpose of winding up and liquidating its affairs. Fidelity further agrees that if it shall desire hereafter to sell or transfer its name it shall offer the same to Pacific States, and Pacific States agrees in such case to pay Fidelity therefor the sum of One Thousand Dollars ($1000.00) in cash.

SEVENTH: The purchase price to be paid to Fidelity in consideration of said sale, transfer and conveyance shall be:

(a) The assumption (subject to the provisions of Paragraph Seventeenth hereof) by Pacific States as of the date hereof, of all of the liabilities of Fidelity shown on said "Memorandum" (it being understood that the items or accounts designated as "Capital" and "Surplus" shall not be deemed to be liabilities within the meaning of this agreement), including all liabilities of Fidelity under the contracts and leases shown in said "Memorandum," and also all other liabilities incurred by Fidelity between March 31, 1931, and the date hereof in the normal course of business; except that Pacific States does not, and shall not, assume

(aa) Any of the outstanding investment certificates of Fidelity (as hereinafter defined) or any of its membership shares or any liabilities of Fidelity whatsoever under or in connection with said investment certificates or membership shares; nor

(bb) Any liabilities of Fidelity which have arisen since March 31, 1931, which Fidelity has herein covenanted that it has not incurred;

(b) The issuance (subject to the provisions of said Paragraph Seventeenth) by Pacific States on October 2, 1931, of its Investment Certificates ar̃ l Fidelity Participating Certificates referred to in Paragraph Fourteenth hereof; and

(c) The payment (subject to the provisions of said Paragraph Seventeenth) by State Guaranty to Fidelity at the "final payment date" (as hereinafter defined) of an amount in cash and/or property as hereinafter set forth, equal to the excess, if any of the amounts credited to "net proceeds" (as hereinafter defined) over and above the amounts debited to said "net proceeds," pursuant to the provisions of this agreement.

EIGHTH: There shall be credited to "net proceeds" the following:

(a) An amount equal to the fact amount of all cash transferred by Fidelity to Pacific States, which credit shall be made as of the date hereof;

(b) Amounts equal to all "valuation payments," (as hereinafter defined) received by Pacific States on any of said assets acquired by it from Fidelity, said credits to be made as and when said "valuation payments" are received;

(c) The amount at which any note acquired from Fidelity, on which no foreclosure or other legal action to collect the same shall be commenced by Pacific States prior to the expiration of four (4) years from· the date hereof, shall be "valued" as provided in subdivision (b) of Paragraph Tenth hereof, such credit to be made at the expiration of four (4) years from the date hereof;

(d) The amount at which any parcel of Real Property (as hereinafter defined) which shall be sold on time payments, the sales price of which shall not have been received in full, shall be deemed to be "valued" pursuant to the provisions of subdivision (c) of Paragraph Tenth hereof, such credit to be made if, as and when such parcel shall be deemed to be "valued" pursuant to the provisions of said subdivision (c) of Paragraph Tenth;

(e) The amount at which any furniture, fixtures and equipment acquired from Fidelity, which shall be used by Pacific States, shall, with the approval of Fidelity, be deemed to be "valued," pursuant to the provisions of subdivision (f) of Paragraph Tenth hereof, such credit to be made if, as and when such approval shall be received from Fidelity;

(f) All interest, rentals and dividends actually received in cash by Pacific States from any asset acquired from Fidelity up to and including the date

on which said asset shall be "valued," said credits to be made as and when the said interest, rentals and dividends shall be received by Pacific States;

(g) All amounts received by Pacific States as the proceeds of any insurance policies on any Real Property or Personal Property (as hereinafter defined) prior to the time such Real or Personal Property shall be "valued," said credits to be made as and when said insurance shall be received;

(h) Seventy-five per cent (75%) of any commissions received by Pacific States Auxiliary Corporation and/or by any other of its affiliated corporations on insurance Pacific States may cause to be written on any Real or Personal Property (as hereinafter defined), or on any property which is security for any note receivable transferred hereunder, prior to the time such Real or Personal Property or such note shall be "valued," said credits to be made as and when said commissions are received by Pacific States; and

(i) Any other amounts provided to be credited to "net proceeds" under any of the provisions of this agreement.

NINTH: There shall be debited to "net proceeds" the following:

(a) The aggregate amount of all liabilities of Fidelity (other than undetermined liabilities which are dealt with in subdivision (b) of this Paragraph Ninth) assumed by Pacific States under any of the provisions of this agreement, including the aggregate amount of liabilities to become payable in the future under all contracts, loan commitments, and leases of Fidelity. The debits provided by this subdivision (a) shall be made as of the date hereof. If after any amount shall be debited to "net proceeds" representing a liability to become payable in the future under any lease running to Fidelity as lessee or under any loan commitment made by Fidelity or under any contract, said liability shall be cancelled in whole or in part, there shall be credited to "net proceeds" an amount equal to the portion of any such liability so cancelled.

If the liability of Pacific States on any lease running to Fidelity shall not have been cancelled prior to a date which is thirty days before the "final payment date," there shall be credited to net proceeds an amount equal to the rental value of the premises for the unexpired term of said lease, which shall be determined by arbitration pursuant to the provisions of paragraph XXII hereof, if the parties hereto are unable to agree thereon.

(b) When any liability which is now undetermined shall become fixed the amount thereof shall be debited to "net proceeds," provided, however, that at the expiration of three (3) years, and eleven (11) months from the date hereof, Pacific States may debit to "net proceeds" an amount equal to the maximum liability, as estimated by Pacific States, which may accrue in the future under any litigation then pending, of the nature of the litigation described in subdivision (i) of this Paragraph Ninth, and the maximum amount as estimated by Pacific States of the liability which may accrue in the future under any guarantees given by Fidelity, or other contingent liabilities of Fidelity, and when the actual amount payable by reason of any such litigation, or payable under any such guarantees, or other contingent liabilities, shall be determined, and adjustment shall be made by the appropriate debit or credit to "net proceeds."

(c) Any interest paid by Pacific States on any liability of Fidelity paid or assumed by Pacific States, such debit to be made as and when such interest is paid; and also all other liabilities of Fidelity paid by Pacific States, whether or not expressly assumed under the terms of this agreement (it being understood that Pacific States may, at its option, pay any liabilities of Fidelity not expressly assumed under this agreement which may come to the knowledge of Pacific States), said debits to be made as and when said liabilities are paid.

(d) An amount equal to the aggregate principal amount of Fidelity investment certificates and membership shares outstanding at the close of business on the date hereof, it being understood that for all the purposes of this agreement the stock shown on said Financial Statement in the "Memorandum" as Guarantee Capital Stock shall in no event be treated as membership shares regardless of the fact that said stock may actually be membership shares; the debits referred to in this subdivision (d) to be made as of the date hereof. Fidelity warrants and represents that it has not issued any Investment Certificates or membership shares or any stock since the close of business on May 14, 1931. The principal amount of any investment certificate or membership shares of Fidelity shall, for all the purposes of this agreement, be deemed to be the amount which Fidelity would have to pay on the principal thereof upon withdrawal thereof.

(e) Interest and dividends accrued and unpaid up to the date hereof on the principal amount of Fidelity Investment Certificates and membership shares, respectively, outstanding as of the close of business on the date hereof; the debits referred to in this subdivision (e) to be made as of the date hereof.

(f) All amounts paid by Pacific States, or its affiliated corporation, Pacific States Auxiliary Corporation, or any other affiliated or subsidiary corpora-

tion of Pacific States (any and all said affiliated or subsidiary companies being hereinafter sometimes for convenience referred to as "affiliated real estate companies"), representing taxes, assessments and insurance premiums, and for the maintenance and/or improvement of Real Property (as hereinafter defined), and all other similar expenses of Pacific States, or any of said affiliated real estate companies in connection with said Real Property. Neither Pacific States nor any of said affiliated real estate companies shall have any authority to make any expenditures for the maintenance or improvement of said Real Property, or any parcel thereof, or similar expenses in connection therewith, for a period of four (4) years from the date hereof without the written approval of the representative who may be designated from time to time by Fidelity to approve such expenditures.

(g) A monthly charge until the "final payment date" hereinabove mentioned, equal to one-eighth of one per cent ($\frac{1}{8}$ of 1%) of the "book value" (as hereinafter defined) of unsold "Real Property" (excluding the property situate at the corner of Ninth and Hill Streets, and the so-called "Cecil Hotel" property in Los Angeles, California), held by Pacific States or any affiliated real estate company at the beginning of each month, said charge being estimated to be the approximate cost to said affiliated real estate companies of keeping accounts and inspecting and superintending the management of real estate, which services Pacific States agrees that one or more of said affiliated real estate companies will perform with respect to said Real Property.

In lieu of the charge mentioned in this paragraph (g), the charge shall, at the option of Fidelity (which option may be exercised each month), be a pro rata of the actual expenses (including rent, light, heat, water, salaries and all overhead expenses) incurred and paid each month by said affiliated real estate companies, in connection with keeping accounts, inspecting, and superintending the management of all real estate held and administered by them, including all real estate acquired by Pacific States and any of said affiliated real estate companies from a source or sources other than Fidelity, such pro rata being the proportionate amount of such expenses, based upon the aggregate "book value" of said Real Property (as hereinafter defined), at the beginning of each month as compared with the total aggregate book value of all real estate held by said affiliated real estate companies at the beginning of said month. The debits provided by this subdivision (g) shall be made monthly as of the end of each month.

(h) All expenses of sale of any Real Property (as hereinafter defined), including advertising and brokers' commissions, and in addition thereto an amount equal to two per cent (2%) of the sales price of each parcel of said Real Property which may be sold, representing the charge of said affiliated real estate companies (except that no such charge shall be paid on the sale of property situated at Ninth and Hill Streets, or on the sale of the so-called "Cecil Hotel" property in Los Angeles), for preparing documents, listing the property and handling the closing of the sale; provided that for a period of four (4) years from the date hereof, the amount of all brokers' commissions and expenses for specific advertising shall first be approved by a representative of Fidelity designated for that purpose, except that no such approval shall be required with respect to brokers' commissions or advertising in connection with sales of Real Property by Pacific States or any of said affiliated real estate companies to make up the annual quota of sales hereinafter mentioned, the prices and terms of which sales need not be approved by Fidelity. The debits for the two per cent (2%) charge mentioned in this subparagraph (h) shall be entered as and when the sales for which such charges are made shall be completed. The other debits provided by this subparagraph (h) shall be made as and when the expenses herein mentioned are paid or incurred.

(i) All expenses of any litigation involving any Real Property (as hereinafter defined) and any other assets acquired by Pacific States from Fidelity and/or the title of Pacific States to said assets, and all expenses of any litigation involving this agreement (provided that if Pacific States shall initiate any such litigation and the same shall be finally determined adversely to it, its attorneys' fees therein shall not be chargeable as a debit to "net proceeds"), including all amounts paid in satisfaction of any judgment in any such litigation, and all reasonable attorneys' fees therein, and all costs, expenses and reasonable attorneys' fees involved in the foreclosure of any mortgage or deed of trust acquired by Pacific States from Fidelity or any mortgage or deed of trust covering any Real Property (as hereinafter defined), provided that if the Trustee under any such deed of trust shall not require any attorney or shall include its attorneys' fee in its Trustee's fee, there shall not be an additional charge for attorneys' fee; and all such expenses involved in the cancellation of any contracts of sale acquired by Pacific States from Fidelity and in the cancellation of any contracts hereafter made by Pacific States for the sale of Real Property.

(j) Expenses of appraising any Real Property (as hereinafter defined) and of the audit provided for in Paragraph Fifteenth hereof, and of securing title and tax reports and policies, it being understood that, in addition to

the appraisals herein provided for, Pacific States may, upon the acquisition of any Real Property by foreclosure, cause the same to be appraised at a cost of not to exceed Fifteen Dollars ($15.00) per day for appraiser's fee (unless a higher per diem shall be approved in writing by the representative of Fidelity), plus travelling expenses of the appraiser.

(k) A monthly charge equal to five hundred ninety-nine one thousandths (599/1000) of one per cent (1%) of an amount to be determined at the beginning of each month until the "final payment date" by taking the sum of $37,549,000.00 (which is approximately equal to the aggregate "book value" as hereinafter defined, at the date hereof, of all assets of Fidelity on accrual basis), and adding thereto a sum equal to all amounts hereafter advanced by Pacific States on loan commitments made by Fidelity which, at the date hereof, are not carried on Fidelity's balance sheet as a liability, and subtracting therefrom an amount equal to all amounts credited to "net proceeds" pursuant to the provisions of subdivisions (a), (b), (c), (d), (e) and (g) of Paragraph Eighth hereof prior to the first day of such month. The debits provided for by this subdivision (k) shall be made monthly as of the beginning of each month.

(l) An amount sufficient to cover the actual and reasonable operating expenses, including salaries and other expenses of Fidelity until November 1, 1931; thereafter and until the "final payment date," an amount not to exceed Twenty-five Hundred Dollars ($2500.00) per month to cover the necessary and reasonable current operating expenses of Fidelity, including employees' salaries, and in addition thereto any and all cost, expenses and reasonable attorneys' fees incurred by Fidelity in any suit, proceeding or litigation arising under, involving or growing out of this agreement or the transfer of assets from Fidelity to Pacific States pursuant hereto, provided that any attorneys' fees so incurred by Fidelity shall be approved as to the amount thereof by the Building and Loan Commissioner of the State of California, all of which amounts will be paid by Pacific States to Fidelity monthly on receipt of a statement of such expenses. The debits provided to be made by this subdivision (l) shall be made monthly as of the end of each month.

(m) All expenses or amounts which Pacific States may pay to prove or quiet its title to any of the assets transferred to it by Fidelity and/or to remove any liens or encumbrances therefrom; it being understood that Pacific States may purchase any bonds or notes secured by a lien on any Real Property (as hereinafter defined) or secured by a lien which is prior to the lien of any mortgage or deed of trust acquired from Fidelity, and debit the cost of the purchase of such bonds or notes to "net proceeds."

(n) Commissions paid to brokers and expenses of sale of any asset (other than the Real Property which is covered in Section "f") acquired from Fidelity; provided that for a period of two (2) years from the date hereof all such commissions shall first be approved by a representative of Fidelity designated for that purpose.

(o) Any amount paid by Pacific States to obtain the cancellation of any leases under which Fidelity is the lessee which may be transferred to Pacific States hereunder. After two (2) years from the date hereof Pacific States may pay such amounts as in its sole discretion it may determine in order to procure the cancellation of any of such leases.

(p) Any expenses and brokers' commissions paid by Pacific States for the leasing of any Real Property (as hereinafter defined) or for the subleasing of any property which is now covered by a lease under which Fidelity is the lessee, provided that for a period of two (2) years from the date hereof all such commissions shall first be approved by a representative of Fidelity designated for that purpose.

(q) Any amount paid by Pacific States to cancel any contracts and contingent or other liabilities of Fidelity and/or claims against Fidelity, it being understood that Pacific States is authorized to pay such amounts as in its sole discretion it may determine in order to procure the cancellation of any such contracts, liabilities and/or claims.

(r) The cost of all examinations conducted by the Building and Loan Commissioner of the State of California relative to the sale, disposal and management of said assets acquired by Pacific States from Fidelity.

(s) Any other amounts provided to be debited to "net proceeds" under any of the provisions of this agreement.

(t) Any other deductions and expenses of Pacific States in connection with the assets acquired from the Fidelity and/or the management thereof which may be approved by a representative of Fidelity designated for the purpose of giving such approval.

The debits provided for by subdivision (f), (i), (j) and (m) to (t), (both inclusive), shall be made as and when the amounts referred to in said subdivisions are paid by Pacific States or, at the option of Pacific States, when the liability to pay the same shall be incurred.

TENTH: For the purposes of this agreement said assets transferred by Fidelity to Pacific States hereunder shall be deemed to be "valued" at the following times, upon the following conditions and at the following amounts, viz.:

(a) Cash shall be deemed to be "valued" at its face amount at the date hereof;

(b) In the case of a Note, payments of principal thereon received by Pacific States after the date hereof shall be deemed to be "valuation" payments thereon and the same shall be deemed to be "valued," if and when the principal and all accrued interest thereon shall have been paid in full, provided that if no foreclosure or other legal action to collect any such note shall be commenced by Pacific States prior to the expiration of four (4) years from the date hereof, the same shall be deemed to be "valued" at the expiration of four (4) years from the date hereof, at the then unpaid principal amount thereof, plus accrued and unpaid interest thereon. If any such note not previously "valued" shall be sold by Pacific States, the same shall be deemed "valued" at the time of such sale and the amount of the consideration received by Pacific States for the unpaid principal of said note shall be deemed to be a "valuation payment" thereon.

(c) In the case of each parcel of Real Property (as hereinafter defined), payments on the principal of the sales price thereof received by Pacific States after the date hereof shall be deemed to be "valuation payments" on such parcel and the same shall be deemed to be "valued" if and when the sales price and all accrued interest thereon shall be paid in full; provided, that if such parcel shall be sold on time payments, it shall be deemed to be "valued" at an amount equal to the unpaid principal of the sales price thereof plus accrued and unpaid interest on said sales prices if and when the balance of the principal of the sales price is not greater than seventy per cent (70%) of the amount at which such property shall be appraised as of the date of sale thereof by an appraiser employed by Pacific States.

(d) In the case of bonds, investment certificates issued by other Building and Loan Associations, judgments in favor of Fidelity, and accounts receivable, payments on the face value or principal amount thereof shall be deemed to be "valuation payments" on such bonds, investment certificates, judgments, or accounts receivable, as the case may be, and the same shall be deemed to have been "valued" if and when paid in full; provided that if any of said bonds, investment certificates, judgments, or accounts receivable shall be sold by Pacific States, the same shall be deemed "valued" at the time of sale and the amount of the principal of the sale price thereof shall be deemed to be a "valuation payment" thereon.

(e) In the case of stock now owned by Fidelity in other corporations, payments on the principal of the sales price thereof or liquidating dividends on such stock shall be deemed to be "valuation payments" on such stock, and the same shall be deemed to have been "valued" when the sales price thereof or final liquidating dividend thereon shall have been paid in full.

(f) In the case of furniture, fixtures, equipment and any other tangible assets acquired by Pacific States from Fidelity, the same shall be deemed to be "valued" when the sales price thereof shall have been received by Pacific States in cash and any payments on said sales price shall be deemed to be "valuation payments" thereon. Pacific States shall not use any of said furniture, fixtures or equipment unless it shall fix an amount with the approval of Fidelity at which the same shall be deemed to be "valued."

(g) For all the purposes of this agreement, and regardless of any actual value thereof, good will, business and other similar intangible assets and all assets which are or shall be unsaleable or shall be lost, stolen or destroyed, are and shall be deemed to be "valued" at nothing.

(h) For the purpose of subdivisions (b), (c) and (d) of this Paragraph Tenth, if Pacific States shall accept any amount less than the unpaid principal of any note, contract of sale, bond, investment certificate, judgment or account receivable, as payment in full thereof, the same shall be deemed to be "valued" at the time of the acceptance of such amount by Pacific States.

ELEVENTH: Pacific States shall have the right to defend any litigation now or hereafter pending against Fidelity and to debit its costs (including reasonable attorney's fees) of defending such litigation to "net proceeds" and (subject to the provisions of Paragraph Twentieth hereof) shall have absolute, unrestricted control of the collections of all contracts of sale of Real Property (as hereinafter defined) and of all notes, mortgages, trust deeds, securities, accounts receivable, insurance claims and other claims transferred to it hereunder by Fidelity or otherwise owing to it, with the right to cancel, compromise, compound or foreclose the same and/or take such action, if any, in respect thereto as in its sole discretion it may determine, when and as in its judgment it considers it to be for its best interest so to do; provided that for a period of four (4) years from the date hereof, no such compromise shall be made without the approval of the representative of Fidelity appointed for that purpose. If any of the notes transferred by Fidelity to Pacific States hereunder shall be secured by one or more Fidelity investment certificates, Pacific States may, upon any default in payment of the principal or interest on said note, exercise all rights of Fidelity to enforce payments and in addition do either of the following, viz.:

 (a) Sell said Fidelity investment certificate or certificates and apply the cash proceeds of sale upon said note, or

 (b) Charge to "net proceeds," immediately prior to the "final payment date," the excess, if any, of the unpaid principal amount of said note, over the amount which Pacific States estimates will be payable on the Definite Term Investment Certificates and Fidelity Participating Certificates which the holder of the Fidelity investment certificates or certificates securing said note will be entitled to receive in exchange for said Fidelity investment certificate or certificates under the provisions of Paragraph Fourteenth hereof.

TWELFTH: A. Pacific States (subject to the provisions of Paragraph Twentieth hereof) shall have charge of the sale of all Real Property (as hereinafter defined) and all other assets acquired by it from Fidelity and may sell the same at such prices and on such terms and conditions as in its sole discretion it may determine without any approval from Fidelity; provided, that without the approval as to price and terms of sale of a representative of Fidelity appointed for the purpose, Pacific States will not (a) sell any notes or street improvement bonds acquired from Fidelity for a period of four (4) years from date hereof, (b) sell any Real Property (as hereinafter defined) for a period of four (4) years from the date hereof unless the annual quota of sales hereinafter set forth shall not be met, or (c) sell any other assets acquired from Fidelity hereunder for a period of two (2) years from the date hereof. Fidelity covenants that such approval will not be unreasonably delayed or withheld in any case. Pacific States covenants that it will not unreasonably withhold from sale any parcel of Real Property (as hereinafter defined) a purchaser for which is produced by Fidelity, if such purchaser is willing to buy such parcel at a price not less than ninety per cent (90%) of the "book value" (as hereinafter defined) of such parcel on terms at least as favorable to Pacific States as the terms set forth in subdivision (D) of this Paragraph Twelfth, and if the monthly payments on principal offered to be made by such purchaser are sufficient so that at the expiration of five (5) years from the date hereof, the unpaid balance of the principal of the sales price of such parcel will not be greater than seventy per cent (70%) of the value of such parcel as appraised as of the date of sale thereof by an appraiser appointed by Pacific States, provided that Pacific States will in no event require interest at a rate greater than seven per cent (7%) per annum on the unpaid balance of the purchase price of any such Real Property without the approval of said Building and Loan Commissioner or of Fidelity.

B. The annual quota of sales of Real Property hereinabove referred to is as follows:

 (a) During the first year after the date hereof, an amount aggregating not less than ten per cent (10%) of the aggregate book value of said Real Property held by Pacific States at the beginning of said year;

 (b) During the second year after the date hereof, an amount aggregating not less than twenty per cent (20%) of the aggregate book value of said Real Property held by Pacific States at the beginning of said year;

 (c) During the third year after the date hereof, an amount aggregating not less than fifty per cent (50%) of the aggregate book value of said Real Property held by Pacific States at the beginning of said year; and

 (d) During the fourth year after the date hereof, the remainder of said Real Property.

If said annual quota of sales is not met in any year, Pacific States may, in its sole discretion, and without obtaining the approval of Fidelity, sell, at such price and on such terms as it may determine, a sufficient amount of Real Property to make up the deficit between the actual sales and the quota, it being understood that the right of Pacific States to sell Real Property to make up said quota shall be absolute and unconditional and shall not be affected by any claim (justified or unjustified) that the failure to meet said quota was due to the fault of Pacific States.

C. Until the "final payment date" Fidelity shall have the right to designate the manager and any other necessary operating personnel of any parcel of unsold Real Property; provided, however, that the salaries of such manager and personnel shall be mutually agreed upon between Pacific States and Fidelity.

D. Unless otherwise approved by Pacific States, all Real Property shall be sold with a down payment of not less than ten per cent (10%) of the sales price thereof with the balance payable in equal monthly installments over a period of not to exceed ten (10) years, bearing interest at the rate of seven per cent (7%) per annum; and the form of any contract or other instrument executed in connection with such sale shall be satisfactory to and approved by Pacific States.

E. After the expiration of four (4) years from the date hereof, Pacific States may sell any and all notes and improvement bonds acquired from Fidelity hereunder, and any and all Real Property at such price and on such terms and conditions and either at public auction or otherwise as it shall, in its sole discretion, determine without the approval of Fidelity. After the expiration of two (2) years from the date hereof Pacific States may sell any and all other assets acquired from Fidelity at such price and on such terms and conditions at public

auction or otherwise as it shall, in its sole discretion, determine, without the approval of Fidelity.

THIRTEENTH: The "final payment date" shall be five (5) years from the date hereof unless postponed in the manner hereinafter set forth; provided, however, that if at any time more than thirty (30) days prior to the date fixed (whether five (5) years or longer from the date hereof) for the final payment "date," all of said assets transferred hereunder shall be "valued," the "final payment date" shall be a date which is thirty (30) days after the time when all of said assets shall be "valued"; and provided further, that if at any time before all of said assets shall be "valued," the credits to "net proceeds" shall exceed the debits to "net proceeds," the "final payment date" shall be the time when said credits shall first exceed said debits.

If, ninety (90) days prior to the "final payment date," the total credits to "net proceeds" shall not exceed the total debits to "net proceeds," and if at such time any of said assets are not "valued," Pacific States shall hold an auction sale prior to the "final payment date" at some place in the City of Los Angeles selected by it, at which auction sale it may sell all of said assets not "valued" prior to such sale.

Pacific States shall give notice of said auction sale by publishing notice thereof once a week for three (3) successive weeks (three (3) publications in all) in a newspaper of general circulation in the City of Los Angeles, which notice shall set forth the time and place and terms of sale (which may be for cash), and shall either give a description of the property to be sold or shall state that the description may be examined at the Los Angeles Office of the Building and Loan Commissioner or at some other specified public place in the City of Los Angeles during the usual business hours. No other notice of said auction sale need be given but Pacific States may give additional notice thereof if it desires to do so. Either State Guaranty or any subsidiary of State Guaranty or any corporation affiliated with Pacific States may be the purchaser at such sale. If, at such "final payment date" the total credits to "net proceeds" shall exceed the total debits to "net proceeds," State Guaranty shall pay the excess to Fidelity, and if at such time there are any other assets acquired by Pacific States from Fidelity which shall not have been "valued" as hereinabove provided, State Guaranty shall acquire said assets from Pacific States and shall convey and deliver the same to Fidelity, subject to the right of Fidelity, as set forth in Paragraph Sixteenth hereof, to have one of said affiliated real estate companies continue for a period of not in excess of two (2) years the management of any Real Property not theretofore sold.

Notwithstanding anything to the contrary herein contained, said "final payment date" and the maturity of the Fidelity Participating Certificates may at any time or times hereafter be postponed, either by Fidelity or by Pacific States, to any date not more than seven (7) years from the date hereof; provided, however, that notwithstanding any said postponements, the "final payment date" shall be thirty (30) days after the time when credits to "net proceeds" shall first exceed debits to "net proceeds," and provided further, that such extension shall be approved in writing either

 (a) By the Holders of Fidelity Participating Certificates representing at least seventy-five per cent (75%) in amount of all such Certificates then outstanding; or

 (b) By the Building and Loan Commissioner of the State of California.

Upon such approval being obtained, the party or parties which shall have procured such approval shall file in the office of the Building and Loan Commissioner a certificate stating that said "final payment date" and the maturity of the Fidelity Participating Certificates has been postponed to a date (specifying the same) and that such postponement has been approved as in this paragraph above provided; and upon the filing of such certificate in the office of said Building and Loan Commissioner said "final payment date" and the maturity of said Fidelity Participating Certificates shall be deemed for all purposes of this agreement to have been postponed as therein provided. The postponement of the maturity of said Fidelity Participating Certificates shall not effect the right of Pacific States to redeem the same prior to the postponed maturity date.

FOURTEENTH: The aggregate principal amount of said investment certificates to be issued by Pacific States, as provided in subparagraph (b) of Paragraph Seventh hereof, shall be equal to seventy-five per cent (75%) of the total of:

 (a) The aggregate principal amount of investment certificates of Fidelity outstanding at the close of business on the date hereof; and

 (b) The aggregate principal amount of membership shares of Fidelity (it being understood that all Class "E" and all stock shown on said financial statement as guarantee capital stock is deemed not to be membership shares) outstanding at the close of business on the date hereof.

Said investment certificates shall be Definite Term Investment Certificates issued under the terms of the Building and Loan Association Act enacted in 1931, shall be payable five (5) years after the date hereof, and shall bear interest at the rate of six per cent (6%) per annum, payable semi-annually, and be subject to

redemption at the principal amount thereof and accrued and unpaid interest to the date of redemption.

The aggregate nominal face amount of said Fidelity Participating Certificates, to be issued as provided in sub-paragrah (b) of Paragraph Seventh hereof, shall be a sum equal to the remaining twenty-five per cent (25%) of the total of the aggregate principal amount of said investment certificates and membership shares of Fidelity referred to in the foregoing sub-paragraphs (a) and (b) of this paragraph. By the terms of said Fidelity Participating Certificates, the Pacific States shall be obligated to pay to the payees therein named a sum equal to the nominal face amount thereof, subject, however, to the deductions, limitations and conditions hereinafter provided for. Said Fidelity Participating Certificates shall bear interest on the nominal face amount thereof at the rate of six per cent (6%) per annum payable semi-annually.

Unless, pursuant to the provisions of Paragraph Seventeenth hereof the obligation of Pacific States to issue said Definite Term Investment Certificates and Fidelity Participating Certificates shall be cancelled or become void, or the time for the issuance of said certificates shall be postponed to a later date as in said paragraph provided, said certificates shall be issued and delivered by Pacific States to Fidelity on October 2, 1931. (The actual date when Pacific States shall be required (if it shall be so required) to issue said certificates is hereinafter referred to as the "certificate delivery date".)

The amounts payable by Pacific States under the terms of said Fidelity Participating Certificates shall be payable five (5) years after the date hereof, unless such time shall be extended in the manner provided in Paragraph Thirteenth hereof, for an additional period not to exceed two (2) years. Pacific States may, however, at its option, upon thirty (30) days' written notice to any holder of said Fidelity Participating Certificate delivered or mailed to his address as shown on the books of Pacific States, redeem such certificates at any time by payment of the amount due thereon determined as hereinafter provided. Interest on said Fidelity Participating Certificates shall cease at the date of redemption fixed in such notice.

The principal amounts of said Definite Term Investment Certificates and the nominal face amounts of said Fidelity Participating Certificates (so far as practicable) be so fixed that for each investment certificate and membership share of Fidelity outstanding at the close of business at the date hereof there will be

(a) A corresponding Definite Term Investment Certificate having a principal amount equal to seventy-five per cent (75%) of the principal amount of such Fidelity Investment Certificate; and

(b) A corresponding Fidelity Participating Certificate having a nominal face amount equal to twenty-five per cent (25%) of the principal amount of such Fidelity Investment Certificate;

provided that all installment membership shares having the same interest payment dates may be treated as one membership share for the purpose of determining the principal amount of the corresponding Definite Term Investment Certificates and Fidelity Participating Certificates.

The first interest payment on each of said Definite Term Investment Certificates and Fidelity Participating Certificates shall be six (6) months after the last interest payment date of the corresponding Fidelity investment certificate or membership share preceding the "certificate delivery date," and Pacific States agrees that the first interest payment after the "certificate delivery date" on each of said Definite Term Investment Certificates and Fidelity Participating Certificates shall be a full six (6) months' interest payment, regardless of the fact that the first interest payment date on said Definite Term Investment Certificates and Fidelity Participating Certificates may be less than six (6) months after the "certificate delivery date"; it being the intention of the parties that interest shall commence to accrue on said Definite Term Investment Certificates and Fidelity Participating Certificates to be issued by Pacific States as of a date six months prior to the first interest payment date specified therein after the "certificate delivery date." Subject to the provisions of Paragraph Seventeenth hereof, Pacific States agrees to pay to Fidelity from time to time (on or prior to the date when said amounts are payable by Fidelity) amounts equal to any interest at rates not exceeding six per cent (6%) per annum which may become due between the date hereof and the "certificate delivery date," on the Fidelity investment certificates outstanding at the close of business on the date hereof, and Fidelity agrees to use the amounts so paid to it to pay the interest which shall become due on its said investment certificates prior to the "certificate delivery date." Subject to the provisions of said Paragraph Seventeenth, Pacific States further agrees to pay to Fidelity from time to time (on or prior to the date when said amounts are payable by Fidelity) amounts equal to any dividends at rates not exceeding six per cent (6%) per annum which may become due between the date hereof and the "certificate delivery date" on any membership shares of Fidelity outstanding at the close of business on the date hereof.

All of said certificates, both investment and participating, to be issued by Pacific States, shall be non-negotiable, and shall be in form satisfactory to the Building and Loan Commissioner of the State of California and to the Pacific States; provided, that all of said Definite Term Investment Certificates shall, at the option of Pacific States, contain any provision (not inconsistent herewith)

desired by Pacific States and authorized by the Building and Loan Association Act enacted in 1931 and the Fidelity Participating Certificates shall contain such statements as Pacific States shall deem advisable indicating that the face amount thereof is payable subject to the deductions, limitations and conditions herein provided.

Notwithstanding anything to the contrary herein contained, the aggregate face amount of the Definite Term Investment Certificates and Fidelity Participating Certificates to be issued by Pacific States pursuant to this Paragraph Fourteenth shall be reduced by an amount equal to the principal amount of any investment certificates of Fidelity which Pacific States shall deliver to Fidelity for cancellation on the "certificate delivery date"; said reduction in aggregate face amount to be in ratio of seventy-five per cent (75%) in Definite Term Investment Certificates and twenty-five per cent (25%) in Fidelity Participating Certificates.

Notwithstanding anything to the contrary herein contained, the maturity date on any Definite Term Investment Certificate to be delivered by Pacific States to Fidelity pursuant to the provisions of this paragraph, may, at the option of Pacific States, be less than five (5) years from the date hereof.

Fidelity agrees that, from time to time upon the delivery to it by Pacific States at any time after the "certificate delivery date," of an investment certificate of Fidelity, properly endorsed for withdrawal or for cancellation, together with all unmatured interest coupons (if any) appertaining thereto, Fidelity will surrender to Pacific States for cancellation, Definite Term Investment Certificates of Pacific States equal in principal amount to Seventy-five per cent (75%) and Fidelity Participating Certificates equal in nominal face amount to twenty-five per cent (25%) of the principal amount of the Fidelity Investment certificate so delivered to it for cancellation and having interest payment dates which fall on interest payment dates of the Fidelity investment certificate so delivered for cancellation, and the maturity date or dates on said Definite Term Investment Certificates so surrendered to Pacific States for cancellation shall be such as may be specified by Pacific States if Definite Term Investment Certificates of such maturities are then held by Fidelity.

All certificates of Fidelity which shall be delivered to it for cancellation or withdrawal, either on the "certificate delivery date" or thereafter, shall be cancelled at the time of the delivery thereof to Fidelity and shall be of no further force or effect.

At any time after the "certificate delivery date," upon surrender to Fidelity for cancellation of any Fidelity investment certificate by the holder thereof (duly indorsed, for cancellation or withdrawal), together with all unmatured interest coupons (if any) appertaining thereto, Fidelity shall (subject to the provisions of Paragraph Seventeenth hereof) assign and deliver to such holder Definite Term Investment Certificates of Pacific States having a principal amount equal to seventy-five per cent (75%) and Fidelity Participating Certificates having a nominal face amount equal to twenty-five per cent (25%) of the principal amount of the Fidelity investment certificate so surrendered by such holder for cancellation, and having interest payment dates which fall on interest payment dates of the certificate surrendered for cancellation; and the maturities of the Definite Term Investment Certificates to be so assigned and delivered by Fidelity shall be such as may be specified by Pacific States in case Definite Term Investment Certificates of such maturities shall be then held by Fidelity.

Any interest received by Fidelity after the certificate delivery date on the Definite Term Investment Certificates and Fidelity Participating Certificates held by it shall be used by Fidelity in payment of the interest on its own outstanding investment certificates which are now and shall at the time of the receipt of such interest be outstanding.

At the time that the amount, if any, which may become due as principal on the Fidelity Participating Certificates becomes payable (whether at the original maturity date, the postponed maturity date, or upon the redemption thereof),

 (a) If the total credits to "net proceeds" shall be equal to or greater than the total debits to "net proceeds," the amount payable on the Fidelity Participating Certificates shall be equal to the nominal face amount thereof, or

 (b) if the total debits to "net proceeds" shall exceed the total credits to "net proceeds," then the amount payable on the Fidelity Participating Certificates shall be the nominal face amount thereof, reduced by the difference between said total debits and total credits to "net proceeds," said reduction to be made pro rata on all of the Fidelity Participating Certificates then outstanding, it being understood that if the total debits to "net proceeds" shall exceed the total credits to "net proceeds" by an amount equal to or greater than the nominal face amount of all of the Fidelity Participating Certificates then outstanding, nothing shall be payable upon the Fidelity Participating Certificates.

If the amount payable on the Fidelity Participating Certificates at the maturity or redemption thereof shall, under the terms of this Paragraph Fourteenth, be less than the nominal face amount thereof, the amount payable on said Fidelity Participating Certificates shall, pursuant to the provisions of Paragraph Fif-

teenth hereof, be increased to the extent provided in said Paragraph Fifteenth.

Fidelity covenants and warrants that the aggregate principal amount of all of said "investment certificates" of "Fidelity" outstanding at the date hereof does not exceed Thirty Million, Six Hundred Sixty-seven Thousand One Hundred Seventy-two and 91/100 Dollars ($30,667,172.91), and that the aggregate principal amount of the membership shares of the Fidelity outstanding at the close of business at the date hereof does not exceed the sum of One Hundred Thirty-six Thousand Five Hundred Forty-two and 48/100 Dollars ($136,542.48), (making a total of Thirty Million, Eight Hundred Three Thousand Seven Hundred Fifteen and 39/100 Dollars ($30,803,715.39) principal amount of outstanding investment certificates and membership shares); and notwithstanding anything to the contrary herein contained, the aggregate principal amount of Definite Term Investment Certificates, if any, which Pacific States shall be required to issue pursuant to Paragraphs Seventh and Fourteenth hereof shall not exceed seventy-five per cent (75%) of said last mentioned sum, and the aggregate nominal face amount of Fidelity Participating Certificates which Pacific States shall be required to issue pursuant to said Paragraphs Seventh and Fourteenth hereof shall not exceed twenty-five per cent (25%) of said last mentioned sum.

Notwithstanding anything to the contrary herein contained, Pacific States may, at the "certificate delivery date," issue to Fidelity one Definite Term Investment Certificate (hereinafter called the "temporary investment certificate"), having a principal amount equal to the aggregate principal amount of Definite Term Investment Certificates which it may be required to issue to Fidelity under the terms of this Paragraph Fourteenth, which temporary investment certificate shall, upon surrender thereof for cancellation by Fidelity, be exchanged by Pacific States for Definite Term Investment Certificates in a like aggregate principal amount, including a new temporary investment certificate and such Definite Term Investment Certificates of the denominations specified in this Paragraph Fourteenth as shall be required at the time by Fidelity to make the exchanges specified in this Paragraph Fourteenth with the holders of its own investment certificates; and thereafter, Fidelity may from time to time make similar exchanges of temporary investment certificates for additional temporary investment certificates and Definite Term Investment Certificates in like principal amount; and Pacific States will make such exchanges without charge or delay. And notwithstanding anything to the contrary herein contained, Pacific States may, at the "certificate delivery date," issue to Fidelity one Fidelity Participating Certificate (hereinafter called the "temporary participating certificate"), having a principal amount equal to the aggregate principal amount of Fidelity Participating Certificates which it may be required to issue to Fidelity under the terms of this Paragraph Fourteenth, which temporary participating certificate shall, upon surrender thereof for cancellation by Fidelity, be exchanged by Pacific States for Fidelity Participating Certificates in a like aggregate principal amount, including a new temporary participating certificate and such Fidelity Participating Certificates of the denominations specified in this Paragraph Fourteenth as shall be required at the time by Fidelity to make the exchanges specified in this Paragraph Fourteenth with the holders of its own investment certificates; and thereafter Fidelity may from time to time make similar exchanges of temporary participating certificates and Fidelity Participating Certificates in like principal amount; and Pacific States will make such exchanges without charge or delay.

FIFTEENTH: As additional consideration for the transfer of said assets over and above the purchase price set forth in Paragraph Seventh, Pacific States agrees (subject to the provisions of Paragraph Seventeenth hereof) to pay the sum of One Million Dollars ($1,000,000.00) on the terms and conditions hereinafter set forth, payable at the following times, viz: One Hundred Thousand ($100,000.00) on October 2, 1931, and Sixteen Thousand Six Hundred Sixty-six and 67/100 Dollars ($16,666.67) on November 1, 1931, and a like amount of Sixteen Thousand Six Hundred Sixty-six and 67/100 Dollars ($16,666.67) on the first day of each month thereafter until the total of One Million Dollars ($1,000,000.00) shall have been paid. Said payment of One Hundred Thousand Dollars ($100,000.00) and monthly payments of Sixteen Thousand Six Hundred Sixty-six and 67/100 Dollars ($16,666.67) shall all be deposited by Pacific States in Wells Fargo Bank and Union Trust Co. of San Francisco (hereinafter called Wells Fargo Bank). Said deposits, together with such interest as may be credited thereon from time to time by Wells Fargo Bank, shall be held by said Bank as a trust, subject to the terms and conditions hereinafter set forth.

Prior to the maturity (original or postponed) of said Fidelity Participating Certificates an audit shall be made by a Certified Public Accountant (who shall be appointed by Pacific States, approved by Fidelity, and shall be satisfactory to the Building and Loan Commissioner of the State of California) to determine the amount (if any) payable by Pacific States on said Fidelity Participating Certificates under the provisions of Paragraph Fourteenth hereof. The result of said audit shall be certified in writing to said Building and Loan Commissioner and to the parties hereto. If said audit shall show that the amount payable by Pacific States on said Fidelity Participating Certificates under the pro-

visions of Paragraph Fourteenth hereof is less than the nominal face amount thereof, said Wells Fargo Bank shall deliver to Pacific States such part of said trust deposit as shall be necessary to make up the difference between the amount payable by Pacific States on said Fidelity Participating Certificates under the provisions of Paragraph Fourteenth hereof, and the face amount of said Fidelity Participating Certificates, and the amount payable on said Fidelity Participating Certificates shall in such case be increased by the portion of said trust deposit delivered to Pacific States by said Bank as aforesaid; and the portion of said trust deposit so delivered to Pacific States shall be held by Pacific States as a trust fund for this purpose and paid by it to the holders of the Fidelity Participating Certificates pro rata at the maturity hereof; and the balance, if any, of said trust deposit shall be delivered by said Wells Fargo Bank to Fidelity. If said audit shall show that Pacific States is required to pay the full nominal face amount of said Fidelity Participating Certificates under the provisions of Paragraph Fourteenth hereof, said bank shall deliver said entire trust deposit to Fidelity. Said Certified Public Accountant shall make and sign a certificate showing the portion (if any) of said trust deposit deliverable to Pacific States and the portion thereof (if any) deliverable to Fidelity, and shall deliver executed copies of said certificate to said Building and Loan Commissioner, said bank, and to each of the parties hereto. Upon the receipt by said bank of such certificate, together with evidence satisfactory to said bank that said accountant has been appointed by the Pacific States and approved by Fidelity and the Building and Loan Commissioner, said Wells Fargo Bank shall, without further authorization, pay out said trust deposit in accordance therewith.

Notwithstanding anything to the contrary herein contained, Pacific States and Fidelity may agree without any such audit as to the amount of said trust deposit payable to each, and said Wells Fargo Bank shall thereupon pay out said deposit in accordance with directions in writing executed on behalf of each of said parties by their respective Presidents and Secretaries.

The parties hereto may at any time, by mutual agreement, change the bank in which said deposits shall be made, and any bank holding said deposits shall hold the same subject to all the terms and conditions of this agreement.

The bank holding such deposit shall at all times while it is holding the same pay thereon the highest rate of interest paid by it at the time being on savings accounts.

Notwithstanding anything to the contrary herein contained, if the "final payment date" is more than ninety (90) days prior to the maturity of said Fidelity Participating Certificates, the audits and certificates provided for in this Paragraph Fifteenth shall be made at the time of said "final payment date" and said Wells Fargo Bank shall pay out said trust deposit upon receipt of the certificate of said audit as hereinabove provided, and thereupon Pacific States shall, at the request of the Building and Loan Commissioner, redeem the Fidelity Participating Certificates by thirty (30) days' written notice to the holders thereof at their addresses as shown on the books of Pacific States and on the date of redemption fixed in said notice, Pacific States shall pay to said holders upon presentation of the Fidelity Participating Certificates held for cancellation, the amount payable thereon as determined by said audit plus accrued interest to the date of redemption, and interest shall cease on said Fidelity Participating Certificates at the date so fixed for redemption thereof.

The audits provided to be made by this Paragraph Fifteenth shall be conclusive and binding on the parties hereto and on the holders of Fidelity Participating Certificates as to the principal amount due thereon.

The bank holding said trust deposit may, prior to paying the same to the parties hereto, deduct therefrom his fees (if any) in connection with the trust provided for in this Paragraph Fifteenth.

It is further agreed that instructions, signed by both of the parties hereto, providing for the distribution of said trust deposit and embodying the terms of this Paragraph Fifteenth and Paragraph Seventeenth hereof and such other terms and provisions as may be appropriate or required by said Bank, shall be delivered to said Bank.

SIXTEENTH: In the event (a) that at the "final payment date" there shall be any unsold Real Property (as hereinafter defined) held by Pacific States and (b) that Fidelity shall notify Pacific States in writing that it desires to have Pacific States continue keeping accounts in connection with, and inspecting, and superintending the management and sale of said unsold Real Property through one of its affiliated real estate companies, then, in lieu of said Real property being conveyed to Fidelity by State Guaranty, as hereinabove provided, Pacific States shall cause one of its said affiliated real estate companies to continue, for such period as Fidelity may determine (not in excess, however, of two years), the keeping of accounts in connection with the inspecting and superintending, the management and sale of said Real Property. Such company shall receive the fees therefor provided in Paragraph Ninth hereof.

In the event of the exercise of this option by Fidelity, all expenditures in connection with the maintenance, repair and/or improvement of said Real Property must first be approved by a representative of Fidelity designated by it for the purpose of approving said expenditures.

SEVENTEENTH: A. Notwithstanding anything to the contrary contained in this agreement, it is understood and agreed that in the event that

(i) On or prior to September 30, 1931, any order, judgment, or decree adjudging the Fidelity to be a bankrupt or insolvent, or setting aside or declaring invalid the conveyance and transfers, or any thereof, made hereby or hereunder, or depriving or purporting to deprive Pacific States of the benefits, or any thereof, of this agreement, or sequestrating any of the funds or property transferred by Fidelity to Pacific States hereby or hereunder or appointing a receiver or custodian for any such funds or property shall be rendered, and such order, judgment or decree shall not be finally set aside and vacated on or prior to September 30, 1931; or

(ii) On September 30, 1931, there shall be pending any suit, proceeding or litigation for the purpose of obtaining any such order, judgment or decree,

the Pacific States shall be entitled, at its option, by a notice in writing delivered or mailed by it to Fidelity not later than October 1, 1931, to cancel this agreement as of the close of business on September 30, 1931.

(B) By mutual consent of all of the parties hereto, however, (to be expressed in a writing or writings signed by them) this agreement may, in either of the cases specified in the foregoing subdivisions (i) and (ii) of sub-paragraph (A) of this Paragraph Seventeenth, be continued in force for any period or periods after September 30, 1931, agreed upon from time to time by said parties; but in such case, until all orders, judgments and decrees (if any there be) referred to in said subdivision (i) shall have been set aside and vacated by final orders, judgments or decrees, and all suits, proceedings and litigation referred to in said subdivision (ii) have been finally dismissed, withdrawn, discontinued or determined by final judgment, and at least ten (10) days shall have elapsed after written notice (specifying titles of courts and causes) of the setting aside and vacating of such orders, judgments and decrees and of the dismissal, withdrawal, discontinuance and determination of said suits, proceedings and litigation shall have been given by Fidelity to Pacific States and to State Guaranty, the obligation of Pacific States to perform any of the following, to-wit:

(a) To deliver to Fidelity said Definite Term Investment Certificates and said Fidelity Participating Certificates as provided in Paragraph Fourteenth hereof; and

(b) To make any of the payments provided by Paragraph Fifteenth hereof;

shall be suspended and inoperative. (The period during which such obligations shall be so suspended and inoperative is hereinafter referred to as the "period of suspension".)

Any of the parties hereto may at any time during the "period of suspension" cancel this agreement by giving to each of the other parties hereto at least five (5) days' written notice of such cancellation; provided, however, that if Fidelity shall give such notice, and if prior to the expiration of the period of five (5) days after the receipt thereof by Pacific States, Pacific States shall notify Fidelity in writing that it does not desire this agreement cancelled and is willing to, and will, perform the obligations referred to in the foregoing sub-divisions (a) and (b) of this sub-paragraph B, this agreement shall continue in full force and effect without the suspension of the obligations of Pacific States referred to in said sub-divisions (a) and (b).

If this agreement shall not have been cancelled prior to the termination of said "period of suspension" pursuant to the foregoing provision of this sub-paragraph B, then upon the termination of said "period of suspension," the obligations of Pacific States in respect to said matters mentioned in said subdivisions (a) and (b) of this sub-paragraph B shall be revived and be again binding upon it.

(C) In the event that this agreement shall be cancelled pursuant to the provisions either of sub-paragraph (A) or sub-paragraph (B) of this Paragraph Seventeenth, neither the Pacific States nor the State Guaranty shall be obligated to issue or deliver the Definite Term Investment Certificates or Fidelity Participating Certificates, or any thereof, mentioned in sub-division (a) of this sub-paragraph (B) and/or in Paragraph Seventh and/or Fourteenth hereof, or to make any of the payments referred to in sub-division (b) of this sub-paragraph (B) and/or in Paragraphs Seventh and/or Fifteenth hereof, or to pay any further amounts to Fidelity representing interest and/or dividends on the outstanding investment certificates and/or membership shares of Fidelity, as provided in Paragraph Fourteenth hereof, or to pay any further amounts on any liabilities of Fidelity assumed by Pacific States under the terms of this agreement, or to pay any further amounts pursuant to sub-division (1) of Paragraph Ninth hereof, or to pay the amount provided to be paid by sub-division (c) of Paragraph Seventh hereof, nor shall Pacific States and State Guaranty, or either of them, be otherwise obligated in respect hereof, and this agreement shall be of no further force or effect, except that the Pacific States shall, in such case, forthwith reconvey and retransfer to Fidelity all of the engagements, funds and property transferred and conveyed by Fidelity to it hereby or hereunder, together with all net income and collections received by it prior to the date of such retransfer and

reconveyance, and all other accessions thereto, less, however, all expenses, interest, and other charges paid or incurred in connection therewith, including all amounts debited to "net proceeds" pursuant to sub-divisions (f) to (j), both inclusive, and (l) to (t), both inclusive, of Paragraph Ninth hereof, and also including (but not in duplication of the amounts covered by any of the subdivisions last mentioned) a fair and proper amount for all book-keeping, management and overhead expenses of Pacific States incurred in the operation of said properties, and also, including all reasonable expenses of Pacific States for attorney's fees in connection with this agreement and such retransfer, and also including all amounts paid by Pacific States on any and all of the liabilities of Fidelity assumed by Pacific States (together with any interest thereon paid by Pacific States), and also including the amounts theretofore paid by Pacific States to Fidelity representing interest on the outstanding investment certificates and dividends on the outstanding membership shares of Fidelity, it being understood that such properties so to be reconveyed and retransferred to Fidelity shall be subject to any contracts of sale entered into by Pacific States prior to such reconveyance or retransfer and any other action taken by Pacific States in respect thereto pursuant to this agreement, prior to the cancellation thereof, and that in case of the sale or other disposition of any of said properties, the net consideration received by Pacific States therefor shall be assigned and transferred to Fidelity in lieu of the property so sold or disposed of.

It is further agreed that in the event of such cancellation Pacific States shall be entitled to reasonable compensation for its services theretofore rendered in connection with said property and to all of its expenses paid or incurred in connection with the management thereof, the amount of said compensation, if the parties shall be unable to agree thereon, to be determined by arbitration in the manner hereinafter provided.

Notwithstanding anything to the contrary herein contained, it is further agreed that in the event of any such cancellation Pacific States shall be entitled to be indemnified against any and all claims against it based upon or arising out of its assumption hereunder of any liabilities of Fidelity, and to that end Pacific States shall be entitled to a first lien and charge upon, and the right to retain possession of, sufficient of said assets to fully protect it against any and all such claims until such time as the same shall have been extinguished or determined by final judgment of a court of competent jurisdiction not to be binding upon Pacific States; and Pacific States, in the event of any such cancellation, shall also be entitled to a first lien and charge upon, and the right to retain possession of, sufficient of said assets to provide for the reimbursement and payment to it of all expenses, interest, compensation and other charges and deductions to which it shall be entitled as in this agreement provided, until all such expenses, interest, compensation, charges and deductions have been paid or extinguished. The Pacific States shall also be entitled to apply any cash which would otherwise be retransferable to Fidelity upon any such cancellation, to the payment of any such expenses, interest, compensation, charges and deductions.

(D) In the event that at any time before the "final payment date" any order, judgment or decree setting aside or declaring invalid the conveyance and transfers, or any thereof, made by or pursuant to this agreement, or depriving or purporting to deprive Pacific States of the benefits, or any thereof, of this agreement, or sequestrating any of the funds or property transferred by Fidelity to Pacific States hereby or hereunder, or appointing a receiver or custodian for any of such funds or property, shall be made or rendered, then and in either of said events Pacific States shall forthwith be entitled, if it shall elect so to do, to have returned to it by said Wells Fargo Bank all amounts theretofore paid by Pacific States to said Bank pursuant to the provisions of Paragraph Fifteenth hereof, together with all interest which shall have accrued thereon, and said Wells Fargo Bank shall, if requested so to do by Pacific States, forthwith return to Pacific States all of said amounts, together with the accrued interest thereon as aforesaid; provided, however, that if on said "final payment date" such order, judgment or decree shall not have become final, the time herein provided for the return to Pacific States by said Wells Fargo Bank of said amounts hereinabove referred to shall be postponed until such order, judgment or decree shall have become final.

EIGHTEENTH: Neither of the parties hereto shall be liable for failure to perform any term or provisions of this agreement if such performance shall be prevented by Act of God, earthquake, riot, civil commotion, orders, judgments, decrees and processes of courts, and other causes beyond the reasonable control of such party; and in the event that any of said parties shall be prevented by any of the causes hereinabove mentioned from performing any term or provision of this agreement, the time for the performance thereof herein prescribed shall, at the option of such party, be extended for a period equal to the period during which such performance shall have been prevented by such cause.

NINETEENTH: 1. Pacific States hereby further agrees:

(a) To furnish to Fidelity, at least quarterly, full, true and correct statements showing in detail, and in form satisfactory to Fidelity, the status of all assets transferred to Pacific States hereunder, together with such other statements and/or information as Fidelity may require in order to main-

tain its books of account, to determine the status of the liquidation of said assets, and generally to inform itself as to matters involving its rights under the terms of this agreement;

(b) To permit the representatives, agents and servants of Fidelity to have access, during business hours, to any and all of the books and records of Pacific States which pertain to the assets transferred hereunder, or which pertain to any matter involving the rights of Fidelity under the terms of this agreement, such access to be for the purpose of making audits, gathering information or verifying statements furnished to Fidelity as herein required.

2. State Guaranty hereby agrees to furnish to Fidelity, at least quarterly, full, true and correct statements of its assets and liabilities, and to permit any certified public accountant appointed by Fidelity and satisfactory to State Guaranty, to examine its books and records for the purpose of verifying any such statement or to determine whether any of the stock of Pacific States owned by it shall have been pledged.

3. The Fidelity shall be conclusively deemed to have assented to and approved any act done by Pacific States in connection with the matters herein referred to, or any thereof, unless it shall have objected thereto in writing within ninety (90) days after receiving knowledge thereof.

4. Neither the Pacific States nor the State Guaranty shall be deemed to have warranted the title, execution, validity, collectibility or value of any property or rights, or any note, mortgage or deed of trust assigned or transferred by them, or either of them, pursuant to the provisions of this agreement.

5. The within agreement and conveyance is intended by the parties hereto as a present sale and transfer of the above described properties by Fidelity to Pacific States, in consideration of the payment of the purchase price therefor hereinabove mentioned, and neither the Pacific States nor the State Guaranty assumes hereby any trust obligation to the Fidelity, or its creditors or any obligations other than those herein expressly assumed. It is, moreover, specifically understood and agreed that neither Pacific States nor State Guaranty assumes hereby any obligation to distribute said purchase price or other funds to or for the benefit of creditors or stockholders of Fidelity or otherwise.

6. Each of the parties hereto, said Building and Loan Commissioner, and any bank holding the trust deposit mentioned in Paragraph Fifteenth hereof, shall be entitled to rely upon any written order, direction, certificate, appointment, designation or approval signed on behalf of any of the parties hereto by the President or any Vice-President, together with the Secretary or any Assistant Secretary of such party without the necessity of a resolution of directors approving such order, direction, certificate, appointment, designation or approval.

7. If in any case in which Pacific States is required or permitted to obtain the consent, approval or directions of any representative of Fidelity, and Fidelity shall fail or neglect to appoint such representative, or such representative (if appointed) shall not be available in San Francisco or Los Angeles for the purpose of giving such consent, approval or directions, or shall unreasonably delay, withhold, or fail to give any such consent, approval, or directions, the same may be given by the Building and Loan Commissioner of the State of California with the same force and effect as if given by such representative.

8. Whenever in this agreement the consent or approval of the Building and Loan Commissioner shall be required or permitted to be given, such consent or approval may be given by any person appointed or designated by said Commissioner, with the same force and effect as if given by said Commissioner personally.

9. It is understood and agreed that the inclusion of any item in said "Memorandum" as the liability of Fidelity shall not be deemed an admission by Pacific States or by Fidelity that such item is in fact a liability of Fidelity, nor shall the debit of such item, or any part thereof, by Pacific States to "net proceeds" be deemed an admission by Pacific States that such item is in fact a liability of Fidelity, and nothing herein contained shall prevent Pacific States and/or Fidelity from contesting or refusing to recognize any such item as a liability of Fidelity, if they, or either of them, shall deem that such item is not in fact a liability of Fidelity; but such contest shall not affect the right of Pacific States to debit the amount of any such liability to "net proceeds."

10. The approval by Fidelity or any representative of Fidelity of any act performed by Pacific States shall have the same force and effect if given after the performance of such act as if given before the performance of such act.

11. If, despite any provision herein contained to the effect that Pacific States shall not perform any act without the approval of Fidelity, or a representative of Fidelity, Pacific States shall perform any such act, such act shall nevertheless be valid, but the amount to be debited or credited to "net proceeds" as a result of the performance of such act shall, if the parties hereto shall be unable to agree thereon, be submitted to arbitration as provided in Paragraph Twenty-second.

TWENTIETH: It is agreed that the only expenses which Pacific States may charge to "net proceeds" are those which it is provided in this agreement may be so charged, and the Building and Loan Commissioner of the State of Cali-

fornia shall have full power at all times until the "final payment date" to make such examinations and to issue and enforce such orders as he shall deem advisable, to the end that no other charges for overhead, keeping of accounts, clerical work, administration, management, or otherwise, shall be made. Said Commissioner shall also have power to disapprove any or all brokers' commissions and expenses for advertising which may be incurred, or proposed to be incurred, by Pacific States in connection with the sale of any of said Real Property, which are in excess of the customary rates and charges therefor or in excess of the rates and charges usually paid by Pacific States in connection with the sale and/or advertising of the sale of other real property belonging to it.

Said Commissioner shall also have power from time to time to make and enforce such reasonable orders as he shall deem necessary for the purpose of facilitating the prompt sale and disposal of said properties acquired by Pacific States from Fidelity.

Pacific States agrees that the prices at which it shall sell any parcel or parcels of Real Property shall be subject to the approval or disapproval of said Commissioner, as hereinafter in this Paragraph Twentieth provided. Such approval may be given either before or after the sale of such Real Property. In the event that Pacific States shall notify said Commissioner in writing of the price at which it proposes to sell any parcel of Real Property and said Commissioner shall not disapprove such price within three (3) days after the receipt by him of such notice, such price shall be deemed to have received his approval, but approval by said Commissioner of the sales price of any Real Property may be given in any other manner. The Commissioner, if he shall deem it unnecessary that such approval be required to be given at any specified time, or during any specified period or periods, or in reference to any particular property or properties or class of properties, may waive for such period or periods as he deems advisable and/or as to any such property or properties, or class of properties, his right to approve or disapprove the prices at which the same may be sold.

Notwithstanding anything to the contrary in this Paragraph Twentieth contained, no such approval shall be required in the case of sale of any property at auction or in the case of the sale of any such property the fair cash value of which (as appraised by any licensed real estate broker in good standing) does not exceed the sum of Five Thousand Dollars ($5,000.00).

The Commissioner may from time to time designate one or more persons to exercise the powers hereby vested in him with respect to the approval of such prices, and in such case the prices approved by the person or persons so designated shall be deemed to have been approved by said Commissioner.

Inasmuch, however, as it is essential that the sale and disposition of all such Real Property be completed prior to the expiration of five (5) years from the date hereof in order that amounts payable upon said Fidelity Participating Certificates may be ascertained prior to their maturity date, it is understood and agreed that the restrictions in this Paragraph Twentieth contained relating to the approval of prices at which sales of said properties may be made and the amounts which may be expended or incurred for brokers' commissions and advertising shall not be applicable in the cases of sales made after July 1, 1935.

It is further agreed that nothing herein contained is intended to limit or have the effect of limiting any right of control over said assets hereby transferred and conveyed by Fidelity to Pacific States, which said Commissioner has or may have under any present or future law of the State of California over other properties of building and loan associations; nor shall anything contained herein preclude said Commissioner from assuming and taking charge of the affairs and business of Fidelity and possession and control of all of its property and assets (other than the property and assets hereby transferred and conveyed to Pacific States hereunder), if he shall hereafter deem such action necessary or advisable.

Said Commissioner may from time to time conduct examinations relative to the sale, disposal and management of the properties acquired by Pacific States from Fidelity, and the costs of all such examinations shall be paid by Pacific States and debited to "net proceeds."

TWENTY-FIRST: Any notice herein required or permitted to be given to Fidelity may be given to it by a writing addressed to it at No. 558 South Spring Street, Los Angeles, California, and delivered to said address or mailed, either in San Francisco or Los Angeles, to it, with the postage thereon fully prepaid. Any notice herein required or permitted to be given to Pacific States may be given to it by a writing addressed to it at No. 745 Market Street, San Francisco, California, and delivered to said address or mailed, either in San Francisco or Los Angeles, to it, with the postage thereon fully prepaid. Any notice herein required or permitted to be given to State Guaranty may be given to it by writing addressed to it at No. 745 Market Street, San Francisco, California, and delivered to said address or mailed, either in San Francisco or Los Angeles, to it, with the postage thereon fully prepaid. Any party hereto may, however, by written notice to the other parties, change its said address for the purpose of receiving such notice. Nothing contained in this Paragraph Twenty-first shall preclude any party hereto from giving notice to any other party hereto in any other manner permitted by law.

TWENTY-SECOND: In the event that any question or controversy shall arise between the parties hereto relating to the interpretation of this agreement or

relating to the rights and/or liabilities of any of the parties hereunder, whether such question or controversy shall arise before or after any termination of this agreement, such question or controversy shall, at the election of either of the parties hereto, be determined by arbitration in the manner following, to-wit:

The party electing to submit such matter to arbitration shall serve written notice to that effect upon the other party and within ten (10) days thereafter each party shall select an arbitrator and give notice of such selection to the other party, and said two arbitrators shall, within ten (10) days after their appointment, select a third arbitrator; said board of three arbitrators shall render its decision upon the question or controversy submitted to them within thirty (30) days after the appointment of said third arbitrator, and the decision of any two of said three (3) arbitrators as to such question or controversy shall be final and binding upon the parties hereto. If, for any reason, said two (2) arbitrators first appointed shall fail to select a third arbitrator within ten (10) days' period, any party to this agreement may apply to the presiding judge of the Superior Court of the State of California in and for the County of Los Angeles for the appointment of said third arbitrator and the person appointed by such judge shall act as the third arbitrator with the same powers as if selected by the first two arbitrators.

Each of the parties hereto shall in good faith perform all acts necessary to be performed by it in order that such question or controversy shall be determined as in this paragraph provided; and no suit or action to enforce any right under this agreement shall be brought or maintained by either of the parties hereto unless such party shall have fully performed all of the agreements in this paragraph agreed to be performed by it.

Nothing herein contained shall require any of the parties to submit to arbitration the price at which sales of Real Property or other assets will be made by Pacific States after the termination of the four-year period after the date hereof or to make up the quota of sales set forth in Paragraph Twelfth.

TWENTY-THIRD: State Guaranty hereby agrees that it will, at all times until said "final payment date" retain the sole ownership of not less than ninety per cent (90%) of the Guarantee Capital Stock of Pacific States, and in addition thereto, that it will own and hold a sufficient number of shares of any other class or classes of stock which may hereafter be issued by Pacific States, so that at all times until said "final payment date" State Guaranty shall own and/or control the voting power of not less than sixty-six and two thirds per cent (66⅔%) of the aggregate outstanding number of shares of all classes of stock of Pacific States.

If at any time State Guaranty shall fail to comply with the foregoing requirement, State Guaranty shall immediately deposit with a Bank or Trust Company satisfactory to Fidelity, an amount of aggregate market value in United States Government bonds or other securities satisfactory to Fidelity, equal to the total amount payable to Fidelity by State Guaranty under the terms of Paragraph Seventh, such amount to be determined by an appraisal which must be commenced immediately upon receipt by State Guaranty of a notice from Fidelity and must be completed within sixty (60) days after such notice. Such bonds or other securities shall be deposited with such Bank or Trust Company under written instructions, authorizing, empowering and directing such Bank or Trust Company to deliver to Fidelity at the "final payment date" an aggregate amount in market value, of such bonds and securities, equal to the amount which Fidelity will be entitled to receive under the terms of Paragraph Seventh above and to return the excess (if any) to State Guaranty; provided, however, that if, for any reason, Fidelity shall be entitled, under the provisions of Paragraph Seventh hereof, to an amount in excess of the market value of said bonds so deposited, then State Guaranty Corporation shall pay such excess to Fidelity in lawful money of the United States at said "final payment date."

Notwithstanding anything to the contrary herein contained, if State Guaranty shall at any time own all of the outstanding Guarantee Capital Stock of Pacific States except Directors' qualifying shares, it may pledge an aggregate number of shares of said stock, the book value of which shall not, at the time of such pledge, exceed Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as security for a loan or loans not to exceed One Million Five Hundred Thousand ($1,500,000.00); provided, however, that, concurrently with the making of any such pledge, State Guaranty shall deposit all the remaining Guarantee Capital Stock of Pacific States owned by it with Wells Fargo Bank & Union Trust Co., as pledgeholder to secure the obligation of State Guaranty to Fidelity under the terms of this agreement. The book value of any such share of Guarantee Capital Stock at any specific time is defined, for the purpose of this agreement, as the sum of the then paid-in capital and paid-in surplus of Pacific States divided by the total number of shares of its Guarantee Capital Stock outstanding at the time. If, at any time thereafter, all of the shares of Pacific States pledged by State Guaranty to secure loans to it are released from pledge and are held by State Guaranty free of any such pledge, the shares to be deposited with Wells Fargo Bank & Union Trust Co., as security for the obligations to Fidelity shall likewise be released by it to State Guaranty, free and clear of any pledge thereof,

to secure State Guaranty's obligations to Fidelity. If, at any time while any shares of Pacific States owned by State Guaranty shall be held by Wells Fargo Bank & Union Trust Co., pursuant to the terms hereof, as security for the obligations of said State Guaranty to Fidelity, State Guaranty shall default in the performance of its said obligations and such default shall continue for thirty (30) days after notice, mailed to State Guaranty and said Bank, or if at any such time any other shares of Pacific States pledged by State Guaranty to secure any indebtedness shall be sold pursuant to the agreement under which they may be pledged, said Wells Fargo Bank & Union Trust Co. shall forthwith, on demand by Fidelity and without further authorization from or notice to State Guaranty, sell the shares of Pacific States held by it as security for the obligations to Fidelity, at public or private sale, without demand, advertisement or notice, and at such price and upon such terms and conditions as it shall in its uncontrolled discretion determine, it being understood that Fidelity and/or Fidelity Investors, Inc., may become the purchaser of said stock at such sale, free and clear of any claims on the part of State Guaranty.

TWENTY-FOURTH: Certain words and terms used in this agreement are hereby defined as follows:

(a) The term "sale" as applied to sales made by Pacific States of any Real Property as hereinafter defined or any other asset acquired from Fidelity shall not include a sale made to Pacific States Auxiliary Corporation or any affiliated company of Pacific States, and, despite any such sale to any such affiliated company, the Real Property covered thereby shall be deemed to be still owned by Pacific States.

Payments of principal or interest received by Pacific States from any sale to Pacific States Auxiliary Corporation or any affiliated company of Pacific States shall not be "valuation payments" and none of said payments shall be credited to "net proceeds." If any of said assets acquired from Fidelity are sold by Pacific States to Pacific States Auxiliary Corporation or any affiliated company of Pacific States, any sale thereof by said Pacific States Auxiliary Corporation or any such affiliated company to third persons who are not parties to this agreement shall be deemed to be a sale by Pacific States and the amounts of principal or interest paid by such third persons on the sales price to Pacific States Auxiliary Corporation or any such affiliated company shall be deemed, for the purposes of this agreement, to have been paid to Pacific States.

(b) The purchase at foreclosure sale by Pacific States or Pacific States Auxiliary Corporation or any affiliated company of Pacific States of any property covered by any mortgage or deed of trust which is security for any note transferred hereunder, or any property covered by any bond transferred hereunder, and the consequent application of the amount bid at any such sale or such note or bond, shall not be treated as a sale of, or the payment of such note or bond and such note or bond shall be deemed, for the purposes of this agreement, to be thereupon "valued" at nothing, but the property acquired at such foreclosure sale, and any judgment claim or right of action for any deficiency under and after foreclosure, shall be treated, for all purposes of this agreement, as if the same had been acquired by Pacific States from Fidelity by this conveyance and agreement.

(c) A sale by Pacific States or Pacific States Auxiliary Corporation, or any affiliated company of Pacific States, of any Real Property as hereinafter defined, under the terms of which a part of the consideration is evidenced by a note of the purchaser secured by mortgage or deed of trust on such Real Property shall, for the purpose of determining when and whether such Real Property shall be deemed to be "valued," be treated in the same manner as a sale of such Real Property under contract wherein title is retained by Pacific States or any affiliated company of Pacific States selling such Real Property.

(d) If prior to the time any Real Property or any other asset acquired from Fidelity shall be "valued," the Real Property or asset shall be transferred by Pacific States to a person, firm or corporation other than Pacific States Auxiliary Corporation or any affiliated company of Pacific States in exchange for other property (and not by way of sale), the asset so transferred shall thereupon be deemed to be "valued" at nothing but the property acquired upon such exchange shall be treated for all purposes of this agreement as if the same had been acquired by Pacific States from Fidelity pursuant to this agreement.

(e) The term "Real Property" shall be deemed to include all Real Property owned by Fidelity as of the date of this agreement and also any real estate acquired by Pacific States or any affiliated company of Pacific States prior to the "final payment date" by purchase at foreclosure sale under any mortgage, deed of trust, or bond transferred hereunder held prior to the time that such bond or the note secured by such mortgage or deed of trust shall be deemed to be "valued," and shall also include any Real Property acquired in exchange for other Real Property or assets transferred hereunder.

(f) The "book value" of any asset of Fidelity as of the date hereof shall be deemed to be the amount at which said asset was carried upon the books of Fidelity as shown by said "Memorandum," subject to any changes in said book value made in the normal course of business between March 31, 1931, and the date hereof; provided, that the book value of any Real Property under contract of sale to Fidelity Auxiliary, Ltd., as of March 31, 1931, shall be deemed to be the amount at which said contract of sale was carried on the books of Fidelity on March 31, 1931 (as shown by said "Memorandum"), subject to any changes in such amount made in the normal course of business between March 31, 1931, and the date hereof.

(ff) Any note received by Pacific States after the date hereof, representing funds advanced by Pacific States pursuant to a loan commitment of Fidelity assumed by Pacific States, shall be treated for the purposes of this agreement as an asset acquired by Pacific States from Fidelity.

(g) The term "book value" as applied to Real Property acquired after the date hereof by foreclosure shall be the unpaid balance of the note or bond foreclosed plus accrued interest thereon to the date of acquisition of such Real Property, plus costs and expenses of foreclosure, including attorneys' fees and court costs, and the "book value" of Real Property acquired by exchange shall be the "book value" of the assets exchanged for such Real Property plus, in the case of both acquisition by foreclosure and exchange, all advances made by Pacific States for the care, maintenance and/or improvement of any of such Real Property and the payment of taxes, assessments and insurance thereon and all other expenses in connection therewith.

(h) The term "foreclosure" as used herein shall be deemed to include the foreclosure of a mortgage or the sale of property by the Trustee under the powers granted in a deed of trust given as security for the payment of a note, and also a sale for the purpose of realizing on the security for any bond, and also the cancellation of any agreement for the sale of Real Property; and in the case of a note secured by a trust deed the filing of a notice of default and election to sell shall be deemed the equivalent of commencing foreclosure proceedings.

(i) The term "Personal Property" shall be deemed to include all furniture, fixtures, equipment and other tangible personal property transferred by Fidelity hereunder to Pacific States, or acquired by Pacific States by foreclosure of any mortgage or deed of trust securing any note transferred to Pacific States hereunder.

(j) The term "investment certificates of Fidelity" shall include not only investment certificates issued by Fidelity but also investment certificates outstanding at the date hereof which were issued by other associations and heretofore assumed by Fidelity in connection with the consolidation or merger of any such other association with Fidelity or the transfer of the assets of any such other association to Fidelity.

IN WITNESS WHEREOF, the parties hereunto have executed this instrument the day and year first above written.

FIDELITY SAVINGS AND LOAN ASSOCIATION
By Geo. L. Eastman, President
By M. T. Williams, Secretary
(SEAL) Party of the First Part.

PACIFIC STATES SAVINGS AND LOAN COMPANY
By E. O. Allison, Vice-President
By John C. Campbell, Asst. Secy.
(SEAL) Party of the Second Part.

STATE GUARANTY CORPORATION
By G. W. Van Brunt, Vice-Pres.
(SEAL) Party of the Third Part.

The foregoing agreement and conveyance dated May 23, 1931, by and between Fidelity Savings and Loan Association, Pacific States Savings and Loan Company and State Guaranty Corporation, and the transfers from said Fidelity Savings and Loan Association to said Pacific States Savings and Loan Company made thereby or pursuant thereto, are hereby approved.

DATED: May 23, 1931. H. L. Carnahan
Building and Loan Commissioner
of the State of California

SUPPLEMENTAL AGREEMENT
Amending
Agreement dated May 23, 1931, for Transfer of Assets from
FIDELITY SAVINGS AND LOAN ASSOCIATION
To
PACIFIC STATES SAVINGS AND LOAN COMPANY

THIS SUPPLEMENTAL AGREEMENT made as of the 1st day of January, 1936, by and between the BUILDING AND LOAN COMMISSIONER OF THE STATE OF CALIFORNIA (hereinafter called the "Commissioner"), as statutory liquidator of Fidelity Savings and Loan Association (hereinafter called "Fidelity"), a corporation organized under the laws of the State of California, which corporation formerly transacted a building and loan association business in said State but is now in possession of the Commissioner and in the process of liquidation, party of the first part, and PACIFIC STATES SAVINGS AND LOAN COMPANY, a building and loan association organized under the laws of the State of California, party of the second part (hereinafter called "Pacific States"),

WHEREAS, under date of May 23, 1931, Fidelity, as party of the first part, Pacific States, as party of the second part, and State Guaranty Corporation, a Delaware corporation, as party of the third part, entered into an agreement and conveyance (hereinafter for convenience referred to as the "Original Fidelity Agreement") whereby, among other things, Fidelity granted, sold, transferred, and conveyed to Pacific States, all the lands, promissory notes, mortgages, deeds of trust, contracts, leases, securities, bonds, stocks, choses in action, cash on hand and in banks, accounts receivable, furniture, fixtures, equipment, business, good will, and all other property and interests in property, both real and personal, owned by Fidelity at the date of said Original Fidelity Agreement, and Pacific States agreed to issue to Fidelity or its investors (a) definite-term investment certificates payable five (5) years after date of an aggregate principal amount equal to seventy-five (75) per cent of the total principal amount of investment-certificate and membership-share liability of Fidelity as of the date of the Original Fidelity Agreement, and (b) Fidelity participating certificates of the nature and character described in said Original Fidelity Agreement, having an aggregate nominal face amount equal to the remaining twenty-five (25) per cent of the total investment-certificate and membership-share liability of Fidelity; and

WHEREAS, said Original Fidelity Agreement provides, among other things, that: (a) the amount payable on said Fidelity participating certificates shall be determined, in the manner provided in said Agreement, by the amount at which the properties acquired by Pacific States from Fidelity are valued; (b) the method of valuation of real estate and certain other properties shall be by the sale thereof; (c) the maturity of said participating certificates is May 23, 1936; and (d) an auction sale shall be held prior to the maturity of said participating certificates at which all real estate and other unvalued property is to be sold; and

WHEREAS, after the date of said Original Fidelity Agreement, and on or about the 17th day of June, 1931, the Commissioner, pursuant to the power and authority conferred upon him by the Building and Loan Association Act of the State of California, took possession of the property, business, and assets of Fidelity, and ever since has retained and still retains such possession of Fidelity, and is now in process of liquidating Fidelity pursuant to the applicable statutory provisions of the State of California; and

WHEREAS, as of December 31, 1935, there were issued and outstanding, pursuant to the terms of the Original Fidelity Agreement, $15,672,865.87 aggregate principal amount of definite-term investment certificates and $87,970.50 aggregate principal amount of Pacific States pass-book certificates into which Fidelity definite-term investment certificates have been converted, and $7,554,635.50 aggregate nominal face amount of Fidelity participating certificates of which $860,875.61 principal amount of definite-term investment certificates, and $286,966.82 nominal face amount of Fidelity participating certificates were held by the Commissioner as statutory liquidator, and the remaining $14,811,990.26 principal amount of definite-term investment certificates, and $7,267,668.68 nominal face amount of Fidelity participating certificates and all of said $87,970.50 principal amount of pass-book certificates were held by various persons, firms, and corporations who (or the predecessors of whom) were formerly Fidelity investors and exchanged their Fidelity investment certificates and membership shares for, and converted the same into, such definite-term investment certificates (or said pass-book certificates) and Fidelity participating certificates; and

WHEREAS, by reason of the long continuing and still existing economic depression, a majority in principal amount of the loans which were transferred by Fidelity to Pacific States under the terms of the Original Fidelity Agreement have gone into default and it has been necessary to foreclose the same and convert them into real estate; and

WHEREAS, an appraisal of the unvalued properties acquired by Pacific States from Fidelity clearly indicates that if such unvalued properties were sold at present market prices there would be nothing payable on the participating certificates at the present maturity thereof (other than the so-called million-dollar

guarantee fund provided for in paragraph Fifteenth of said Original Fidelity Agreement) ; and

WHEREAS, the great majority of said remaining Fidelity properties consist of foreclosed real estate, street improvement and assessment bonds, and other properties which it would be impossible to sell under present market conditions without undue sacrifice; and

WHEREAS, it is believed that the holding, prior to May 23, 1936, of an auction sale of such unvalued properties (which total many millions of dollars) would result in injury to all parties concerned and to the general real estate market and the general public as well; and

WHEREAS, in view of the prospects of a generally improved real estate market, the possibility of inflation, and the prospect of discovery of oil on some of said Fidelity properties, it is deemed advisable to extend the period of valuation and the maturity of said participating certificates for a period of two years, in the expectation and hope that the holders of said participating certificates may be entitled at that time to some recovery thereon; and

WHEREAS, any extension of the maturity of said participating certificates which provided for the payment of interest thereon would be inequitable and unjustified in view of the value of the Fidelity properties; and

WHEREAS, Pacific States is willing to agree to adjust its fees and charges under the Original Fidelity Agreement and to agree to such extension on the terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of the premises, it is mutually agreed by and between the parties hereto as follows:

1. The maturity of all outstanding Fidelity definite-term investment certificates and Fidelity participating certificates is hereby extended to May 23, 1938, and the "final payment date" specified in the Original Fidelity Agreement is hereby fixed at May 23, 1938; provided, however, that the holder of any outstanding Fidelity definite-term investment certificate may, at his option, at any time hereafter before the final payment date (as hereby extended), exchange his Fidelity definite-term investment certificate for, and convert the same into, a regular full-paid or pass-book investment certificate of Pacific States, of equal value and similar in all other terms to other investment certificates then being issued by Pacific States.

2. The Fidelity definite-term investment certificates shall bear interest until paid at the rate of four (4) per cent per annum (the reduction of said rate on interest payments heretofore or hereafter made being hereby agreed to). The reduction to said rate of 4% per annum on interest payments heretofore made on said Fidelity participating certificates is hereby agreed to, and each of said outstanding participating certificates shall continue to bear interest at said rate of 4% per annum until such time as there shall have been paid thereon the pro rata share of said million-dollar guarantee fund payable on such participating certificate, after which time all interest on said participating certificates shall cease; provided, however, that in no event shall any such Fidelity participating certificate bear any interest from and after May 23, 1936. Notwithstanding anything to the contrary herein contained, no payment or distribution of any kind shall be made to Fidelity under the terms and provisions of subparagraph (c) of Paragraph Seventh of said Original Fidelity Agreement, unless and until there shall have first been paid to the holders of all outstanding participating certificates, interest at the rate of four (4) per cent per annum on the nominal face value of their participating certificates remaining unpaid, from the date on which said participating certificates cease to bear interest as hereinbefore provided, until the date of payment of the remainder of the nominal face value of said participating certificates, or May 23, 1938, whichever date is earlier.

3. Between May 23, 1936, and May 23, 1938, any asset not "valued" under the Original Fidelity Agreement may be "valued" at any amount agreed upon between Pacific States and the representative originally appointed by Fidelity under the Original Fidelity Agreement; provided, however, that, within ten days after such "valuation" shall have been so agreed upon, Pacific States and the representative of Fidelity shall give notice thereof in writing to the Commissioner and the Commissioner shall have the power to disprove any such "valuation"; provided, further, that if the Commissioner shall not disapprove such "valuation" agreement within fifteen days after the receipt by him of such notice, such "valuation" shall be deemed to have received his approval. If, at any time during said period, there be no Fidelity representative then appointed and capable of acting, any asset not theretofore "valued" under the Original Fidelity Agreement or under the terms of this supplemental agreement, may be "valued" at any amount agreed upon between Pacific States and the Commissioner.

4. Pacific States agrees, within ten (10) days after the date this supplemental agreement becomes effective, to anticipate and prepay the remaining installments required to be paid into the million-dollar guarantee fund provided for in paragraph Fifteenth of the Original Fidelity Agreement; and all such amounts shall be debited to "net proceeds" when paid by Pacific States. Said million-dollar fund (together with the interest credited thereto) shall be paid pro rata to the respective holders of all outstanding Fidelity participating certificates as a payment

on the nominal face amount of their respective participating certificates, each such holder to be paid his pro rata share of said fund forthwith (and without awaiting the final payment date) upon execution by him of a consent to this agreement and presentation of his participating certificate for endorsement of such payment thereon. Such payment shall be evidenced on each such participating certificate by stamping on the face thereof a legend as follows:

"See endorsement on the reverse of this certificate"

and by stamping on the reverse of each such participating certificate an endorsement as follows:

"The nominal face amount of the within participating certificate has been reduced by the amount of $......, by the payment in cash of such amount to the holder of the within participating certificate on the date of this endorsement (being the pro rata share of the million-dollar guarantee fund provided for in paragraph Fifteenth of the within-mentioned Agreement payable in respect of such participating certificate), and in consideration of such payment such holder of this participating certificate has agreed and hereby agrees (for himself, his successors and assigns): that all interest on said participating certificate has been paid in full to the date of this endorsement; that said participating certificate shall cease to bear interest from and after the date of this endorsement, or from and after May 23, 1936, whichever date shall be earlier; and that the maturity of said participating certificate has been extended to May 23, 1938.
Dated: ..................................................."

5. If any asset acquired from Fidelity and not heretofore "valued" is hereafter exchanged for one or more Fidelity definite-term investment certificates, or for Pacific States investment certificates into which Fidelity definite-term investment certificates have been converted, such asset shall be "valued" at the principal amount of the investment certificates for which it has been exchanged.

6. Said Original Fidelity Agreement shall be amended as of January 1, 1936, as follows, to wit:

(a) Subdivision (f) of paragraph Eighth is hereby amended to read as follows:

"(f) All interest, rentals, dividends and other income actually received in cash by Pacific States from any asset acquired from Fidelity up to and including the date on which said asset shall be 'valued'; said credits to be made as and when the said interest, rentals, dividends and other income shall be received by Pacific States; provided, however, that in respect of assets not 'valued' prior to December 31, 1935, the interest, rentals, dividends and other income received therefrom which shall have accrued after December 31, 1935, or shall be applicable to the period after December 31, 1935, shall not be credited to 'net proceeds'."

(b) Subdivision (h) of paragraph Eighth is stricken from said agreement.

(c) Subdivision (f) of paragraph Ninth is amended to read as follows:

"(f) All amounts paid by Pacific States representing assessments on and/or improvements to Real Property normally chargeable to capital in accordance with Pacific States' usual practice, and all other expenditures in connection with any asset acquired from Fidelity which, in accordance with Pacific States' usual practice, would be chargeable to capital."

(d) Subdivision (g) of paragraph Ninth is stricken from said Agreement.

(e) Subdivision (h) of paragraph Ninth is amended to read as follows:

"(h) All expenses of sale of any real property or other assets acquired from Fidelity, including advertising and brokerage commissions," said debits to be made as and when the expenses are paid or incurred."

(f) Subdivision (i) of paragraph Ninth is amended by adding thereto the following:

"provided, however, that there shall not be charged as a debit to 'net proceeds' attorneys' fees which would normally be considered as operating expenses in accordance with Pacific States' usual practice, and which are paid in respect of normal and usual operating problems."

(g) Subdivision (j) of paragraph Ninth is amended to read as follows:

"(j) Expenses of securing title and tax reports and policies in respect of any Real Property."

(h) Subdivisions (k) and (p) of paragraph Ninth are stricken from said Agreement.

(i) A new subdivision (u) is added to paragraph Ninth reading as follows:

"(u) An amount equal to all enforceable claims (not paid prior to July 1, 1936) for interest accrued up to December 31, 1935 on said Fidelity definite-term investment certificates and/or Fidelity partici-

pating certificates. Said debit shall be made immediately prior to the final payment date as extended."

The foregoing changes in said Fidelity Agreement shall not affect debits or credits made under the amended or stricken paragraphs prior to January 1, 1936, and the foregoing substituted and new paragraphs shall be effective from and after January 1, 1936, as a part of said Original Fidelity Agreement.

Notwithstanding anything to the contrary herein contained, all losses, taxes, expenses and other amounts accrued up to December 31, 1935, or applicable to the period prior to December 31, 1935, chargeable to net proceeds under the terms of the Original Fidelity Agreement shall, despite the terms of this supplemental agreement, be charged to net proceeds even though paid after December 31, 1935.

7. The remaining book value of the "unvalued" assets acquired from Fidelity as of January 1, 1936, after deducting therefrom all "valuation payments" made thereon, is hereby fixed at $18,396,862.96. The book value of the "unvalued" assets acquired from Fidelity shall, on any particular date, be the result obtained by adding to the said book value on January 1, 1936, all debits to "net proceeds" which would normally be considered as capital expenditures in accordance with Pacific States' usual practice, and subtracting therefrom all credits to "net proceeds" pursuant to subdivisions (b), (d), (e) and (g) of paragraph Eighth of said Original Fidelity Agreement, and the amount at which any asset is "valued" pursuant to paragraphs 3 or 5 of this supplemental agreement. The average book value of "unvalued" assets acquired from Fidelity for the period from January 1, 1936, to May 23, 1938, shall be computed by taking the book value determined as above set forth of said assets on the first day of each month from and including January 1, 1936, to May 1, 1938, and averaging said book values.

If, immediately prior to the final payment date (as extended), the total credits to "net proceeds" equal or exceed the total debits to "net proceeds," or if the total debits to "net proceeds" do not exceed the total credits to "net proceeds" by the then aggregate nominal face amount of all then outstanding Fidelity participating certificates, Pacific States shall make the following two computations: (a) it shall determine the average book value over the period from January 1, 1936, to May 23, 1938, of the "unvalued" assets acquired from Fidelity in the manner above set forth in this paragraph, and shall determine the amount which would have been obtained if net income of 7.2% per annum on said average book value had been received for the entire period from January 1, 1936, to May 23, 1938; (b) it shall determine the total actual net income (as said term "net income" is hereinafter defined), received between said dates on "unvalued" assets acquired from Fidelity, and if the result obtained by computation (a) exceeds the result obtained by computation (b), Pacific States is authorized to debit an amount equal to such excess to "net proceeds" as of a time immediately prior to the final payment date as extended; but if the result obtained by computation (b) exceeds the result obtained by computation (a), Pacific States shall credit an amount equal to such excess to "net proceeds" as of a time immediately prior to the final payment date as extended. As used in this paragraph, "gross income" includes all income of every kind or nature from said assets, excluding, however, profits on sales or exchanges and certificate and other capital transactions, but including (without limiting the generality of the foregoing) interest, rentals, royalties, dividends and insurance commissions (said commissions, however, being limited to commissions on insurance which Pacific States may cause to be written on any Real or Personal Property as defined in the Original Fidelity Agreement, or any property which is security for any note receivable transferred under the Original Fidelity Agreement prior to the time such Real or Personal Property, or such note, shall be "valued"). As used in this paragraph, "net income" means gross income less all operating expenses of every kind and nature in connection with assets acquired from Fidelity, including the expense items which would have been debited to "net proceeds" were it not for this supplemental agreement, but excluding (a) losses on sales or exchanges and certificate and other capital transactions; (b) interest on Fidelity definite-term investment certificates and Fidelity participating certificates, and on Pacific States certificates, into which any Fidelity definite-term investment certificates may be converted; (c) amounts debited to "net proceeds"; (d) taxes based on or measured by income; (e) overhead expenses of Pacific States; and (f) depreciation and depletion.

For the purpose of determining gross and net income under this paragraph, dividends on the stock of Cortaro Farms Company and Marana Irrigation Company, as well as interest on the notes of said companies, shall be excluded, and the income and expenses of said companies shall be treated as though their properties were directly owned by Pacific States as an asset acquired from Fidelity.

8. Except as hereinafter provided, all charges of Pacific States made up to the date hereof under the provisions of the Original Fidelity Agreement, and all debits to "net proceeds" made to January 1, 1936, are hereby ratified, confirmed and approved; and it is hereby agreed that up to January 1, 1936, Pacific States has made all the credits to "net proceeds" required to be made under said Original Fidelity Agreement; provided, however, that the following matter shall

be left open for future determination and settlement without prejudice either to Pacific States or to Fidelity, viz.: by reason of the reduction of interest rates paid on Fidelity definite-term investment certificates and Fidelity participating certificates from 6% to 4% since March 10, 1933, as provided by the so-called Emergency Building and Loan Association Act (and amendments thereto), Fidelity claims that it is entitled to a greater reduction than that already credited by Pacific States to the debits provided to be made to "net proceeds" by subparagraph (k) of paragraph Ninth of said Original Fidelity Agreement; while on the other hand Pacific States claims that there should be no such reduction in said debits and that the credits heretofore made in that respect should be reversed.

9. In all respects, except as herein expressly or necessarily modified, said Original Fidelity Agreement shall remain in full force and effect and is hereby ratified and confirmed.

10. This agreement shall not become effective unless and until it shall have been (a) approved by the Superior Court of the State of California, in and for the County of Los Angeles, and (b) approved in writing by the holders of seventy-five (75) per cent of the aggregate nominal face amount of all outstanding Fidelity participating certificates, and by the holders of 75% of the aggregate face amount of all outstanding Fidelity definite-term investment certificates, on or before March 20th, 1936 (or within such later extended time as may be stipulated by Pacific States by written notice to the Commissioner); provided, however, that by written notice to the Commissioner Pacific States may cause this agreement to become effective at any time without approval of the holders of said certificates. Regardless of the actual date on which this agreement becomes effective, as aforesaid, it shall for all purposes hereof take effect as of January 1, 1936.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written..

LOUIS C. DRAPEAU<br>
*Building and Loan Commissioner of*<br>
*the State of California*<br>
Party of the first part.

[SEAL] PACIFIC STATES SAVINGS AND LOAN COMPANY,<br>
By ROBERT S. ODELL<br>
*President*<br>
By H. K. OUIMET<br>
*Asst. Secretary*<br>
Party of the second part.

State Guaranty Corporation, a party to said Original Fidelity Agreement, hereby ratifies and approves the foregoing supplemental agreement.

[SEAL] STATE GUARANTY CORPORATION,<br>
By A. E. FALCH<br>
*President*<br>
By BURT WINSLOW<br>
*Secretary*